BLANKENSHIP CONSTRUCTION COMPANY AND BEATRICE BLANKENSHIP, EXECUTRIX UNDER THE WILL OF A. V. BLANKENSHIP, DECEASED v. NORTH CAROLINA STATE HIGHWAY COMMISSION

No. 7526SC727

(Filed 3 March 1976)

Highways and Cartways § 9— building of highway — claim for additional compensation — notice and record keeping requirements of contract — failure of contractor to meet — action dismissed

In an action to recover additional compensation for the building of two sections of highways during which plaintiff contractor encountered unexpected rock conditions, the trial court properly determined that the notice and record keeping requirements of the parties' contract were not satisfied with respect to the plaintiff's claim for additional compensation, since the contract required that in order to qualify for additional compensation the plaintiff was required to furnish defendant written notice of the alleged changed conditions and, in the event the plaintiff and defendant failed to reach an agreement concerning the alleged changed conditions, keep an accurate and detailed cost record with the same particularity as force account records, which record defendant must be given the opportunity to supervise and check; but plaintiff orally notified defendant of the unexpected rock conditions, defendant informed plaintiff that a claim for additional compensation under a given section of the contract was precluded by the nature of the bid, plaintiff accepted defendant's reasoning and proceeded with the project, and after completion of the project plaintiff filed a claim for additional compensation and at that time prepared cost records in support of its claim.

APPEAL by plaintiffs from *Martin (Harry C.), Judge.* Judgment entered 25 March 1975 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 13 January 1976.

The plaintiffs in this case are Blankenship Construction Company (a North Carolina corporation) and Beatrice Blankenship, executrix under the will of A. V. Blankenship, deceased. (These plaintiffs will hereinafter be referred to as Blankenship or the Contractor.) The defendant is the North Carolina State Highway Commission (now the Board of Transportation, hereinafter referred to as the Commission), an agency of the State authorized to let contracts for the construction of highways. This appeal arises out of a contract between the Commission and Blankenship for the construction of Projects 8.1657505 and 8.1657507 (hereinafter referred to as the Project), which consists of a segment of Interstate 85 northeast of Charlotte, extending to the Mecklenburg-Cabarrus County line, and the "In-

terstate 29 Connector," which is roughly three miles long and connects Interstate 85 with U.S. 29, two miles west of the Mecklenburg-Cabarrus County line.

The evidence tends to show the following: On or about 20 April 1966 Blankenship received an invitation to submit a bid for the Project described above. The Contractor promptly requested plans for the Project. The Contractor had three weeks to prepare its bid. After receiving plans and cross-sections for the Project, the Contractor spent one full day inspecting the site of the Project. They encountered no evidence of rock or other unusual conditions.

The plans prepared by the Commission indicated that the Commission had sponsored an investigation of the subsurface conditions of the Project and offered the results of this investigation to prospective bidders. However, to obtain the subsurface report, the Contractor was required to execute a form letter containing the following provisions:

> "The information contained herein [i.e., the subsurface report] is not implied or guaranteed by the North Carolina State Highway Commission as being accurate nor is it considered to be a part of the plans, specifications or contract for the project."
>
> .  .  .  .
>
> "By having requested this information, the contractor specifically waives any claim for increased compensation or extension of time based on differences between the conditions indicated herein and the actual conditions at the project site."

The earth work summaries in the subsurface report disclosed approximately 27,000 cubic yards of rock throughout the Project. An amended earth work summary mailed to the Contractor a few days before the bid was due reflected 135,000 cubic yards of rock. This discrepancy did not pose a serious problem, for the Contractor "did not feel this was inconsistent with the profile sheets [they] already had because by taking the profile sheets and a plenimeter [they] came up with approximately 129,000 or 130,000 cubic yards. . . ."

The testimony of F. C. Seckler, the employee of the Commission who conducted the subsurface investigation, suggests that the subsurface report mailed to the Contractor did not

contain the full extent of his findings; specifically, the report did not indicate the discovery of rock at several drilling stations used for the subsurface investigation.

To prepare its bid, the Contractor considered more than 100 distinct work items. The largest category of work by far and the largest single cost item in the bid was unclassified excavation. Section 22 of the Standard Specifications for Roads and Structures, prepared by the Commission and incorporated in the contract, is entitled "Roadway and Drainage Excavation."

> "22-1.1 DESCRIPTION. This item shall consist of the removal and satisfactory disposal of all materials excavated within the limits of the right of way, including such intersecting roads, driveways, streets, outlooks, parking areas, unsuitable subgrade material and the replacement of such unsuitable material with satisfactory material, and shall include such excavation as is necessary for berm, inlet, outlet and lateral drainage ditches; for stripping material pits, and for the formation, compacting and shaping of all embankments, subgrade, shoulders, slopes, intersections, approaches, and private entrances, to conform to the typical cross section shown on the plans and to the lines and grades set by the Engineer. . . ."

Section 22-1.2 defines four classes of excavation: (a) Solid Rock Excavation; (b) Unclassified Excavation; (c) Drainage Ditch Excavation; and (d) Stripping Excavation. It appears from the definition of unclassified excavation that it encompasses any and all of the other classes of excavation encountered within the original slope stakes: "Unclassified Excavation shall include all excavation within the limits of the original slope stakes." (22-1.2[b]).

The proposed contract called for approximately 2,076,000 cubic yards of unclassified excavation, and the Contractor bid $612,420.00 for this item. The bid for unclassified excavation was based on two major cost considerations: first, the estimated quantity of solid rock (130,000 cubic yards) was multiplied by the rate of $1.50 per cubic yard; and the remaining amount of excavation, the so-called "rough excavation," was calculated at a rate of about $.22 per cubic yard. The Contractor's total bid amounted to $1,570,369.19. As the lowest bidder, Blankenship was awarded the contract for the Project on 11 May 1966. After

the contract was executed by both parties, the Contractor began work on the Project in late June.

As work progressed, the Contractor encountered more rock excavation than originally anticipated. The first cut on the Project was made at Station 180 in July 1966, and it was mostly rock. Likewise, the next cut consisted of a large quantity of rock. None of this rock appeared in the subsurface information supplied by the Commission. In the fall the first major cut also contained large quantities of rock, and at this stage the Contractor realized that its original estimate of solid rock excavation was grossly inaccurate. Rather than the original estimate of 130,000 cubic yards, the Contractor's evidence reveals that between 750,000 and 800,000 cubic yards of rock were encountered on the job.

Due to the unexpected quantities of rock, the Contractor fell behind schedule. The construction engineer's report dated 18 January 1967 contained the following reference to the large quantities of rock:

> "Unclassified material has high percentage rock making it ideal for working this time of year. Contractor has placed another culvert crew on project in an attempt to increase culvert construction which is falling behind."

In April 1967 Malcolm Blankenship called John Davis, the Commission's chief engineer, to discuss the unexpected quantities of rock.

> "At that time I didn't know John Davis. I went to the field office which was just a few feet, I went inside and picked up the phone and called information and got the Commission telephone number and called it. The operator inside the Highway Commission building answered the phone, and I asked for Mr. John Davis. They connected me with Mr. Davis, and I told Mr. Davis this was Malcolm Blankenship, and I would like to come up and discuss the amount of rock on the project with him. He told me that we had bid the job unclassified. I was trying to talk to him about the difference in the amount of rock that we incurred from that shown on the subsurface information and that we were encountering rock throughout the job. He asked me if we received a letter. I told him we did. Then he confirmed that we had received the subsurface information, then he asked me what was on the subsurface information

and I told him, but there was a big difference between it and what we found, and I would like to come up to see him. He said it wouldn't be necessary for me to come up and see him. I would just be wasting my time and his time, too. I didn't know much what to say then. He said, 'Now, if you want to come on, you can come,' but he said, 'You'll just be wasting your time.' That ended the conversation."

The contract completion date, originally 1 December 1967, was extended to 21 April 1968 by supplemental agreement and pursuant to the extension of time terms of the contract. Due to the large quantity of rock excavation and other problems, the Contractor did not finish the Project until 9 March 1969. The Contractor received partial payments as the work was done and a final payment after completion of the Project. In all the Contractor was paid $1,506,369.10, after a $64,000.00 deduction from contract price for liquidated damages as provided by the contract.

Malcolm Blankenship kept a regular record of significant occurrences on the job by making notations almost daily on his personal set of plans. The quantity of solid and ripping rock excavated was recorded in this form. In addition the Contractor maintained payroll records which provided the information for periodic reports to the Commission and the Federal Government.

Approximately one year after the completion of the Project, the Contractor filed a claim for additional compensation. Meanwhile, the final estimate for work performed under the contract was paid on 24 January 1972. On 14 April 1972 the Contractor filed a verified claim with the State Highway Administrator in the amount of $4,167,276.30. The verified claim contained numerous separate claims within the following broad categories: (A) Failure of Commission to make right of way available ($136,016.08); (B) Commission's changes in work ($284,281.11); (C) Errors in plans ($406,809.10); (D) Errors in subsurface information ($2,723,048.27); (E) Changes in work caused by third parties ($79,225.44); (F) Errors in Commission's computation of quantities ($421,666.58); (G) Extended overhead ($50,400.00); (H) Delays — Liquidated damages ($65,800.00); (I) Recapitulation; and (J) Interest. The Administrator denied the claim *in toto,* and the Contractor promptly filed suit in the Mecklenburg County Superior Court according to G.S. 136-29.

In the summer of 1973, while the suit was pending, the Contractor turned over to the Commission its cost records relating to the job. At the request of the Highway Commission, Malcolm Blankenship prepared a comprehensive cost summary, first on a weekly basis and then on a daily basis. According to Blankenship's testimony:

"Plaintiffs' Exhibits P-18 (a), (b), (c) and (d) are the cost records which I got up for the State at their request. They relate to the various items of the claim that I have previously discussed here in Court. I obtained the information from my payroll. I also obtained the information as to what equipment was used from my payroll. I also used my own memory and recollection in preparing the material. The plans that I had on the project, previously identified as P-5(a), were used as sort of a diary on the job. I referred to those notations and records in preparing the records. In addition I referred to the diaries and daily reports which were kept by our company and A. V. Blankenship.

"I had some diaries that were kept by my foremen and daily reports, also some that were kept by A. V. Blankenship, and some daily reports that were prepared from time to time. Sometime during the construction of the project some of our diaries and daily reports were destroyed by fire. This was in the fall of 1966 and would have involved approximately the first few months on the job.

"These diaries and daily reports were made available for inspection by the State auditors and its attorneys when they were in Atlanta. The information for example relating to parts and repair that were used for the maintenance of the equipment on this job was obtained from our company books. Information on things like dynamite and fuel were obtained from invoices and from the company's ledgers and the company books. This was true with respect to the parts since there were invoices for those too. All of these were in Atlanta and all of those were in the same filing cabinets that we made available to the State auditors and attorney."

For the convenience of the Commission and the court, a summary of the cost records described above was prepared (P-19); the first two pages summarize all the costs, while the remainder depicts costs according to each specific claim.

At the conclusion of plaintiffs' evidence at trial, the trial judge rendered judgment against the plaintiff Contractor. The judgment was buttressed by findings of fact with respect to each claim. Of paramount importance to this appeal are the "additional specific findings with reference to each and every claim item submitted by the contractor":

"203. The court finds, with regard to each and every claim presented by the contractor in its verified claim and complaint which requested additional compensation, that the contract requires the contractor, before beginning work on any aspect of construction that the contractor believed to be entitled to compensation over and above that stipulated in the contract or for which there is no provision in the contract for compensation, to give the Engineer of the defendant written notice of such request for such additional payment for such alleged work.

"204. In addition, the contract requires the contractor, before any work or any aspect of construction in issue is begun and after written notice of a request for additional compensation is given and is denied by the Engineer, to further notify the Engineer in writing of its intent to file a claim for additional payment for such alleged work.

"205. Moreover, in conjunction with the written notice of the intention to file a claim, the contract requires the contractor to keep, during the course of construction of the work in issue, an accurate and detailed cost record of such work in accordance with the procedures provided by Section 9.4 of the Standard Specifications.

"206. The contract requires that the records, which are kept during the course of construction of the work in issue, shall be made available to the Engineer of the defendant in order that the Engineer can supervise and check the keeping of the contractor's records.

"207. The cost records for the construction items in issue are required by the contract to be kept separate and apart from the general records kept by the contractor during the course of the construction of the project as a whole.

"208. Specifically, with regard to each and every claim for compensation in the contractor's verified claim and com-

plaint, the court finds that there was no credible evidence that the contractor:

"(a) gave written notice to the Engineer of the defendant, before beginning work on any item of construction now mentioned in its claim, that it was entitled to compensation for the work to be performed over and above that stipulated in the contract or for any work it contended was not in the contract;

"(b) gave written notice to the Engineer of the defendant, before beginning work on any item of construction now mentioned in its claim, that it would file a claim for additional payment for such alleged work;

"(c) kept, during the course of construction of the work in issue, accurate and detailed cost records of such work in accordance with the procedures provided by Section 9.4 of the contract;

"(d) made any cost records available to the Engineer of the defendant during the course of construction of the work in issue in order that the Engineer could supervise and check the keeping of such records; or

"(e) kept any cost records of the construction items in issue separate and apart from the general records kept by the contractor during the course of the construction of the project as a whole.

"209. The court further finds, however, that the contractor failed to present any competent evidence of any records, in the manner required by the contract or otherwise, of the costs applicable to the various items now claimed by the contractor in its verified claim and complaint.

"210. The contractor's exhibits 18-A, 18-B, 18-C, 18-D and 19 were prepared after this lawsuit was filed and do not otherwise comply with the contract provisions for the keeping of cost records for work performed for which the contractor claims to be entitled to additional compensation.

"211. The contract provided for compensation for the actual work done at the contract unit prices in the absence

Construction Co. v. Highway Comm.

of compliance with contract provisions for additional compensation, which included compensation for work required because of errors, changes or alterations in the plans and specifications.

"212. The contract anticipated that there could be errors and changes or alterations in the plans and specifications in the construction of the project.

"213. The contractor has failed to produce any competent evidence to show compliance with the provisions for the keeping of cost records required of the contract to support any part of its claim.

"214. The written contract which the contractor executed clearly provided the method by which the contractor could insure himself of additional compensation which he might be entitled to for changes, alterations or additional work performed.

"215. The credible evidence of this case, clearly show non-compliance on the part of the contractor with the conditions and provisions of the contract for obtaining additional compensation by reason of alterations, changes or extra work."

*Greene, Buckley, DeRieux & Jones, by Ferdinand Buckley, James A. Eichelberger, and Frank E. Jenkins III; and Kennedy, Covington, Lobdell & Hickman, by Hugh L. Lobdell, attorneys for plaintiffs.*

*Attorney General Edmisten, by Eugene A. Smith, Special Deputy Attorney General, and Robert W. Kaylor, Associate Attorney, for the defendant.*

BROCK, Chief Judge.

It is appropriate to preface this opinion by acknowledging the well-established rule that the Commission is not subject to suit except in the manner provided by statute. *Teer Co. v. Highway Commission*, 265 N.C. 1, 143 S.E. 2d 247 (1965). General Statute 136-29 establishes the procedure for the settlement of claims against the Commission by a contractor who has not received "such settlement as he claims to be entitled to under his contract." This language has been construed to mean that recovery is possible only within the terms and framework of the contract. *Teer Co. v. North Carolina State Highway Comm.*,

4 N.C. App. 126, 166 S.E. 2d 705 (1969). Thus the general question raised by this appeal is whether the Contractor is entitled to compensation in excess of the original contract price under the provisions of its contract with the Commission.

The Contractor's claim for additional compensation is governed by several provisions of the "Standard Specifications for Roads and Structures" incorporated into the construction contract. The first is entitled "Changed Conditions"; in particular, Section 4.3A, "Alteration of Plans or Character of Work":

"The Commission reserves the right to make, at any time during the progress of the work, such increases or decreases in quantities and such alterations in the details of construction, including alterations in the grade or alinement of the road or structure or both, as may be found to be necessary or desirable. Such increases or decreases and alterations shall not invalidate the contract nor release the Surety, and the Contractor agrees to accept the work as altered, the same as if it had been a part of the original contract.

"Under no circumstances shall alterations of plans or of the nature of the work involve work beyond the termini of the proposed construction except as may be necessary to satisfactorily complete the project.

"Unless such alterations and increases or decreases materially change the character of the work to be performed or the cost thereof, the altered work shall be paid for at the same unit prices as other parts of the work. *If, however, the character of the work or the unit costs thereof are materially changed, an allowance shall be made on such basis as may have been agreed to in advance of the performance of the work, or in case no such agreement has been reached, then the altered work shall be paid for by force account in accordance with Article 9.4.*

"No claim shall be made by the Contractor for any loss of anticipated profits because of any such alteration, or by reason of any variation between the approximate quantities and the quantities of work as done.

"Should the Contractor encounter or the Commission discover during the progress of the work conditions at the site differing materially from those indicated in the con-

Construction Co. v. Highway Comm.

tract, which conditions could not have been discovered by reasonable examination of the site, *the Engineer shall be promptly notified in writing of such conditions before they are disturbed*. The Engineer will thereupon promptly investigate the conditions and if he finds they do so materially differ and cause a material increase or decrease in the cost of performance of the contract, an equitable adjustment will be made and a supplemental agreement entered into accordingly.

"In the event that the Commission and the Contractor are unable to reach an agreement concerning the alleged changed conditions, *the Contractor will be required to keep an accurate and detailed cost record which will indicate not only the cost of the work done under the alleged changed conditions, but the cost of any remaining unaffected quantity of any bid item which has had some of its quantities affected by the alleged changed conditions, and failure to keep such a record shall be a bar to any recovery by reason of such alleged changed conditions. Such cost records will be kept with the same particularity as force account records and the Commission shall be given the same opportunity to supervise and check the keeping of such records as is done in force account work*." (Emphasis added.)

According to this language, whether a material change in the character of the work is induced by increases or decreases in quantities or alterations in the details of construction by the Commission, or the result of unexpected conditions at the site, the Contractor is required to notify the Commission of the changed condition(s) and negotiate an "allowance" or "equitable adjustment" to be embodied in a supplemental agreement. In the case of altered work, if no agreement can be reached, the altered work shall be paid for by force account. Similarly, in the case of work done under changed conditions, if the Contractor and Commission fail to negotiate a supplemental agreement, the Contractor must keep cost records of such work "with the same particularity as force account records."

In addition to the procedures discussed above for compensation for changed conditions, the contract provides for payment of "Extra Work," Section 4.4. Extra work is defined as "construction for which there is no unit or lump sum contract price" (Section 1.26). Payment for extra work is predicated on a determination by the Engineer that there is extra work to be

performed and an authorized modification providing for the performance of extra work. If the Contractor and Engineer agree on the price for the extra work, a supplemental agreement should be issued in conjunction with the authorized modification; if no agreement is reached for the price of extra work, the Contractor must furnish "a force account notice" in conjunction with the authorized modification (Sections 4.4[A][1] and [2]). In the event the Engineer disagrees that there is extra work and issues a written denial of the Contractor's request for an authorized modification, but the Contractor intends to seek compensation for performing such alleged extra work, the following procedures apply:

> ". . . [The Contractor] shall notify the Engineer in writing of his intention to file a claim for such payment and shall receive written acknowledgement from the Engineer that such notification has been received before he begins any of the alleged extra work. In such case the Contractor will be required to keep an accurate and detailed cost record which will indicate the cost of performing the extra work. Such cost records will be kept with the same particularity as force account records and the Commission shall be given the same opportunity to supervise and check the keeping of such records as is done in force account work.

> "The Contractor's claim to increased compensation as provided herein will be limited to the amount which would have been due the Contractor if payment for the work had been made on a force account basis as provided by Article 9.4." (Section 4.4C.)

Therefore, whether the work performed falls in the category of "altered work," "work done under the changed conditions," or "extra work," the procedures for obtaining additional compensation are generally the same. In each case the Contractor must first seek a supplemental agreement for the price of the work in question prior to the performance of such work. If an agreement cannot be reached, the Contractor must insure that the Engineer or Commission is on notice of its intention to file a claim for additional compensation, maintain accurate and detailed cost records "with the same particularity as force account records," and provide the Commission the same opportunity to supervise the keeping of such records as is done in force account work.

Section 9.4, entitled "Force Account Work," describes the manner in which work done on a force account basis is paid for:

"1. Labor. For all labor and foremen in direct charge of the specific operations, the Contractor shall receive the base rate of wages (or scale) actually being paid by the Contractor for the class or classes of labor normally necessary to perform the work for each and every hour that said labor and foremen are actually engaged in such work, to which rate 30% will be added. Before beginning the work the Contractor shall file with the Engineer for his approval a list of all wage rates applicable to the work. Approval will not be granted where these wage rates are not actually representative of wages being paid elsewhere on the project for comparable classes of labor performing similar work, or where these wage rates include costs paid to or on behalf of workmen by reason of any fringe benefit.

"2. Bond, Insurance, and Tax. For property damage, liability, and workmen's compensation insurance premiums, unemployment insurance contributions and social security taxes on the force account work, the Contractor shall receive the actual cost, to which cost 6% will be added. The Contractor shall furnish satisfactory evidence of the rate or rates paid for such bond, insurance, and tax.

"3. Materials. For materials accepted by the Engineer and used, the Contractor shall receive the actual cost of such materials delivered on the work, including transportation charges paid by him (exclusive of machinery rentals as hereinafter set forth), to which cost 15% will be added.

"4. Equipment. For any machinery or special equipment (other than small tools) including fuel, lubricants, cutting edges, all repairs and all other operating and maintenance costs (other than operator) plus transportation costs for equipment not already on the project, the Contractor shall receive the rental rates listed in the current schedule published by the Associated Equipment Distributors. When equipment is used for

a period less than one month, the rental rate shall be computed on an hourly basis using an hourly rate which is 1/176 of the monthly rate. When equipment is used for a period of one month or more, the rental rate shall be on a monthly rate basis.

"5. Miscellaneous. No additional allowance will be made for general superintendance, the use of small tools, or other costs for which no specific allowance is herein provided.

"6. Compensation. The Contractor's representative and the Engineer shall compare records of the cost of work done as ordered on a force account basis.

"7. Statements. No payment will be made for work performed on a force account basis until the Contractor has furnished the Engineer with duplicate itemized statements of the cost of such force account work detailed as follows:

"a. Name, classification, date, daily hours, total hours, rate, and extension for each laborer and foreman.

"b. Designation, dates, daily hours, total hours, rental rate, and extension for each unit of machinery and equipment.

"c. Quantities of materials, prices, and extensions.

"d. Transportation of materials.

"e. Cost of property damage, liability and workmen's compensation insurance premiums, unemployment insurance contributions, and social security tax.

"Statements shall be accompanied and supported by receipted invoices for all materials used and transportation charges. However, if materials used on the force account work are not specifically purchased for such work but are taken from the Contractor's stock, then in lieu of the invoices the Contractor shall furnish an affidavit certifying that such materials were taken from his stock, that the quantity claimed was actually used, and that the price and transportation claimed represents the actual cost to the Contractor."

Strict compliance with the contract provisions discussed above is a vital prerequisite for the recovery of additional compensa-

tion based on altered work, changed conditions, or extra work. The Contractor assigns error to the trial judge's finding that the Contractor failed to comply with the notice requirement and the record-keeping requirement prescribed by the contract in connection with its claims for additional compensation.

In order to qualify for additional compensation under Sections 4.3A or 4.4(C), the Contractor is required to furnish the Engineer written notice of the alleged changed conditions and, in the event the Contractor and Engineer fail to reach an agreement concerning the alleged changed conditions, keep an accurate and detailed cost record with the same particularity as force account records. Furthermore, the Commission must be given the same opportunity to supervise and check the keeping of such records as is done in force account work.

While the form of the notice—written or oral—may not be critical, the content of the notice must satisfy the underlying purpose of the notice requirement. In this case the Contractor orally notified the Engineer in the spring of 1967 of the unexpected rock conditions. The Engineer, Mr. Davis, informed the Contractor that the nature of the bid as "unclassified excavation" precluded a claim for additional compensation under Section 4.3A. It appears that the Contractor accepted Mr. Davis' reasoning and proceeded with the Project. Then, after completion of work on the Project, the Contractor filed a claim for additional compensation and at that time prepared cost records in support of its claim. In our opinion the purpose of the notice requirement of Section 4.3A is to apprise the Commission of the Contractor's belief that he has encountered "work conditions at the site differing materially from those indicated in the contract" for which he is entitled to an "equitable adjustment." The Contractor's notice in this case was equivocal at best; from the Engineer's standpoint, it amounted to a tentative inquiry rather than a forceful indication of changed conditions and demand for equitable compensation. Under the particular circumstances of this case, we affirm the trial judge's finding that the notice requirement of Section 4.3A or 4.4 was not satisfied with respect to the Contractor's claim for additional compensation.

Even if the Contractor's notice had sufficed, and the Engineer's response is given the same effect as a denial of changed conditions, it appears that the Contractor failed to comply with the record-keeping requirement of Section 4.3A or 4.4(C). The

Contractor's cost records, although derived from records kept by the Contractor during the course of the Project, were prepared after the completion of the Project. When viewed in conjunction with the notice requirement, it is clear that the record-keeping provision is designed to involve both parties in the record-keeping process as the work in question is performed. The contract specifies the form and manner in which the cost records must be prepared.

> ". . . The Commission shall be given the same opportunity to supervise and check the *keeping* of such records as is done in force account work." (Emphasis added.)

In Section 9.4(1) concerning the force account payment for labor, the following appears: "Before beginning the work the Contractor shall file with the Engineer for his approval a list of all wage rates applicable to the work."

Taken together, these provisions require that the cost account records be kept as the work in question is performed. The latter requirement in Section 9.4(1) presupposes that the Contractor has given the Commission clear and unequivocal notice of its desire to be compensated for altered work, work under changed conditions, or extra work prior to performing any of the work in question. Furthermore, the provision in Section 4.3A, which is repeated in Section 4.4(C) (Claims for Increased Compensation for Extra Work), affords the Commission an opportunity to supervise and check the *keeping* of the cost records. The policy of this provision is clear: such supervision and checking, to be effective at all in protecting the State from a claim based on inaccurate cost estimates, must be made possible as the work is performed. Had the Contractor in this case maintained such records during the course of the Project and notified the Commission of this action so as to provide the Commission with the opportunity to supervise and check the keeping of these records, the only question would be whether the Contractor encountered changed conditions or extra work under Sections 4.3 and 4.4. However, failure to comply with the notice and record-keeping requirements constitutes a fatal flaw in all of the Contractor's claims for additional compensation.

In construing the provisions of Sections 4.3 and 4.4, we are not blind to the possibility that the Contractor in this case encountered considerably changed conditions and extra work. But the position of the Contractor must be balanced against the

Commission's compelling need to be notified of a "changed conditions" or "extra work" problem and oversee the cost records for the work in question. The notice and record-keeping requirements are clearly set forth in the contract. The Contractor's failure to comply with these procedures is inexcusable. The Contractor first discovered the alleged changed conditions in the fall of 1967; the work on the entire Project was completed on 7 March 1969. On 2 January 1970 the Contractor filed a claim for additional compensation. After receiving payment for the final estimate under the contract, the Contractor filed a verified claim in the spring of 1972 for $4,167,276.30, more than twice the original contract price. The Commission did not receive adequate notice of the claim or have a sufficient opportunity to supervise the maintenance of the cost records as prescribed by Sections 4.3 and 4.4. The notice and record-keeping procedures of these provisions are not oppressive or unreasonable; to the contrary, they are dictated by considerations of accountability and sound fiscal policy. The State should not be obligated to pay a claim for additional compensation unless it is given a reasonable opportunity to insure that the claim is based on accurate determinations of work and cost. The notice and record-keeping requirements constitute reasonable protective measures, and the Contractor's failure to adhere to these requirements is necessarily a bar to recovery for additional compensation.

We find no error in the dismissal of plaintiffs' claim for remission of liquidated damages without prejudice. Even if such a dismissal were improper, it would not affect the validity of the findings of fact and conclusions of law with respect to plaintiffs' other claims. Plaintiffs' opportunity under the judgment of dismissal to commence a new action within a year on their claim for liquidated damages withheld by the Commission fully cured any conceivable error underlying the dismissal. This assignment of error is overruled.

The judgment of the trial court is

Affirmed.

Judges BRITT and MORRIS concur.