INLAND BRIDGE COMPANY, INC. AND ROADBUILDERS, INC. (A JOINT VENTURE) v. NORTH CAROLINA STATE HIGHWAY COMMISSION (NOW BOARD OF TRANSPORTATION)

No. 7610SC262

(Filed 1 September 1976)

1. Highways and Cartways § 9— road building — no misrepresentation as to soil conditions

In an action to recover damages allegedly resulting from certain misrepresentations made by defendant to plaintiffs in the letting of a contract for road grading and construction, findings of the trial court were clearly supported by the evidence and were sufficient to support the conclusion that defendant did not misrepresent the composition and moisture of the soil to be encountered in the construction of the project.

2. Highways and Cartways § 9— claim against Highway Commission — hearing by State Highway Administrator prerequisite

Plaintiffs were bound by their claim based solely on misrepresentation filed with the State Highway Administrator, and they were estopped from developing additional theories in the superior

court, since G.S. 136-29 provides that any claim against the Highway Commission must first be made to the State Highway Administrator, and the claimant must set forth facts upon which the claim is based.

**3. Highways and Cartways § 9— building of road — claim for additional compensation — failure to comply with contract — no recovery**

   In an action to recover damages allegedly resulting from certain misrepresentations made by defendant to plaintiffs in the letting of a contract for road grading and construction, findings by the trial court that plaintiffs failed to notify defendant of changed conditions in accordance with the contract and that plaintiffs failed to keep force account records as required by the contract were supported by the evidence; therefore, the court properly concluded that plaintiffs were not entitled to recover additional compensation for extra work since they failed to comply strictly with the contract.

APPEAL by plaintiffs from *Bailey, Judge.* Judgment entered 1 December 1975 in Superior Court, WAKE County. Heard in the Court of Appeals 17 June 1976.

This is a civil action wherein the plaintiffs, Inland Bridge Company, Inc. and Roadbuilders, Inc. (a Joint Venture), are seeking $169,820.94 damages from the defendant, North Carolina State Highway Commission (now Board of Transportation), allegedly resulting from certain misrepresentations made by defendant to plaintiffs in the letting of a contract for road grading and construction.

In their complaint plaintiffs alleged in part that they entered into a contract with defendant on 29 August 1967 for the "relocation of U.S. 21 in Charlotte from the south city limits northerly to a point approximately 0.4 miles south of Shuman Road." Part of the project consisted of the building of certain embankments for a roadway which required excavation, filling, hauling, drying and compacting the material to specifications. Contained in the contract was the following:

   "Note to contractor: the contractor's attention is directed to the fact that the natural moisture of the material to be placed in the embankment is approximately 40%. This material shall be dried to optimum moisture as determined by the engineer."

In bidding on the project, plaintiff relied upon and were entitled to rely upon the representation that the moisture content of the fill dirt was 40%. In fact the natural moisture was not approximately 40% but in many instances greatly exceeded

40%. The defendant had actual knowledge that the soil to be used in the embankments "could not be practically moved and dried." Notwithstanding this knowledge, defendant classified the soil as "Unclassified" rather than "Unsuitable," "without alluding to the facts known to it as to the condition of the material and as to the impracticability of processing it as called for by the contract."

> "That as a result of the incorrect classification of the dirt, soil and material in the contract proposal and representation by the defendant and as a result of the defendant's failure to make known to plaintiffs the true condition of said material and defendant's concealment of vital and relevant information in regard thereto from the plaintiffs * * * the plaintiffs incurred excess costs on said project in the amount of $169,820.94."

The defendant answered denying that there was any material misrepresentation of the conditions of the fill dirt. In addition, in a memorandum supporting defendant's motions for dismissal and summary judgment, defendant alleged that there were procedures to follow, as set out by the contract, when the contractor encountered conditions different from those indicated in the contract and that plaintiffs had failed to follow those procedures. Plaintiffs also filed a motion for summary judgment with supporting affidavits. Plaintiffs' motion and defendant's motions were denied.

At trial without a jury, the proposal, the contract, and the Standard Specifications for Roads and Structures (SSRS), incorporated by reference into the contract, were introduced into evidence. Included in the SSRS are the following pertinent provisions:

> "4.3A Should the Contractor encounter or the Commission discover during the progress of the work conditions at the site differing materially from those indicated in the contract, which conditions could not have been discovered by reasonable examination of the site, the Engineer shall be promptly notified in writing of such conditions before they are disturbed. The Engineer will thereupon promptly investigate the conditions and if he finds they do so materially differ and cause a material increase or decrease in the cost of perform-

ance of the contract, an equitable adjustment will be made and a supplemental agreement entered into accordingly."

4.4(B) Request for Authorized Modification:

Whenever, the Contractor is required to perform work which is, in his opinion, extra work, and an authorized modification therefor has not been issued by the Engineer, then the Contractor may make written request for an authorized modification at any time before beginning any of the alleged extra work.

Where the Engineer agrees that there is such extra work to be performed then he will issue an authorized modification providing for the performance of the extra work in conjunction with a supplemental agreement if prices have been agreed upon, or with a force account notice if agreement on prices has not been reached, to provide payment for the extra work. The Contractor will not be authorized to begin any extra work until he has received the authorized modification pertaining to such extra work.

Where the Engineer does not agree that there is such extra work to be performed, then he will issue a written denial of the Contractor's request for an authorized modification."

"4.4(C) If the Contractor's request for an authorized modification has been denied by the Engineer and the Contractor intends to file a claim for payment for performing such alleged extra work, he shall notify the Engineer in writing of his intention to file a claim for such payment and shall receive written acknowledgment from the Engineer that such notification has been received before he begins any of the alleged extra work. In such case the Contractor will be required to keep an accurate and detailed cost record which will indicate the cost of performing the extra work. Such cost records will be kept with the same particularity as force account records and the Commission shall be given the same opportunity to supervise and check the keeping of such records as is done in force account work."

Bridge Co. v. Highway Comm.

"22-3.8 The classification of all roadway and drainage excavation shall be made by the Engineer as the work progresses and the classification as determined by the Engineer for the work completed each month will be included in the current monthly estimate. If classification thus allowed is protested by the contractor, the claim must be made in writing by him within 30 days after the current estimate is mailed to him."

"22-1.1 Description [Roadway and Drainage Excavation]. This item shall consist of the removal and satisfactory disposal of all . . . unsuitable subgrade material and the replacement of such unsuitable material with satisfactory material . . . "

"22-1.2 The classification of all materials excavated shall be as follows:

* * *

(b) Unclassified Excavation shall include all excavation within the limits of the original slope stakes. * * *

Unsuitable material shall be classified as any material which is unsatisfactory for use under a base course or pavement. It shall not include any rock undercut in the roadbed."

Included in the proposal were the following pertinent provisions:

"UNCLASSIFIED EXCAVATION:

This item shall include the removal of all existing flexible type pavement, walls, steps and other masonry items inside or outside the limits of the right of way which in the opinion of the Engineer is rendered useless for highway purposes by the construction of this project. These items that are removed shall be used in embankments or disposed of in waste areas furnished by the Contractor.

These items that are removed will be measured and paid for at the contract unit price per cubic yard, 'Unclassified Excavation'. The cost of disposal shall be included in the unit price bid per cubic yard 'Unclassified Excavation'."

"AVAILABILITY OF SUBSURFACE INFORMATION:

The Commission will make available, only upon specific request by a prospective bidder, subsurface information pertaining to this project. Such information will be made available, without warranty implied or expressed as to accuracy, only where a request is submitted to the Commission on a form letter inserted elsewhere in the proposal for this purpose, and in accordance with the conditions set out in such form letter."

"UNSUITABLE MATERIAL EXCAVATION:

The Contractor will be required to remove unsuitable material at locations as shown in the plans and other locations as the Engineer may direct. The unsuitable material shall be removed to a depth of 3 feet below the top of the subgrade or to widths and depths as directed by the Engineer."

"NOTE TO CONTRACTOR:

The Contractor's attention is directed to the fact that the natural moisture of the material to be placed in embankments is approximately 40%. This material shall be dried to optimum moisture as determined by the Engineer."

Plaintiffs bid $342,650.00 for excavation of unclassified material which was computed at $.77 per cubic foot of excavation. They bid $36,250.00 for excavation of unsuitable material which was computed at $2.50 per cubic yard. Prior to bidding, they requested the "subsurface information" from the defendant, which was introduced at trial. On each page of the information which defendant supplied, there was stamped the following:

"Note: The information contained herein is not implied or guaranteed by the N. C. State Highway Commission as being accurate, nor is it considered to be a part of the plans, specifications, or contract for the project.

By having requested this information the contractor specifically waives any claim for increased compensation or extension of time based on differences between the conditions indicated herein and the actual conditions at the project site."

Included in the information was data showing natural soil moisture test results from ten tests. The results ranged from 29.4% to 43.3% natural moisture.

At trial Marion Lowe, Job Superintendent for plaintiffs, Mr. Fred Triplett, President of Inland Bridge Company, and Dr. W. Kenneth Humphries, Professor of Engineering at the University of South Carolina with a doctorate in soils mechanics. testified for plaintiffs. Together their testimony in part showed the following:

Plaintiffs began work at the site in August 1967. Almost immediately after beginning work, it became apparent that it was going to be difficult to dry the soil to optimum moisture or to compact it to the 95% density as required by the engineer. On 20 November 1967, they met with representatives of defendant and discussed with them the problems that had arisen. Defendant offered certain suggestions and began on site soil moisture testing. On 26 March 1968, plaintiffs met with defendant's representatives again to discuss the problem of drying the soil. At that meeting, Triplett stated that it was "not feasible to try to dry this material," and that he was employing every possible means to dry the material but that it would not be possible to dry the material "within practical methods" before the time set for completion of the project. Mr. Roberts, for the defendant, agreed to come out to see if everything possible was being done.

In April, 1968, Triplett performed his own "natural moisture" analysis and obtained results on his 16 tests showing moisture content as high as 66.6%. Almost none of the test results were below 40%.

It was the opinion of Lowe that over half the "unclassified material" was in fact "unsuitable material."

Humphries explained that the soil in the area of the project was difficult to work with. The nature of the soil caused it to retain moisure more than normal soil and when compacted it had a tendency to increase the capillary action of the soil in drawing water up from the levels below. In his opinion the soil was unsuitable for use on the project. It was his opinion that there was nothing in the contract to put the plaintiffs on notice that the soil would be unsuitable. He also testified, however, that as a soils expert he would have concluded on the basis of the subsurface information and the project plans alone that the material was unsuitable.

On 6 May 1968, Triplett wrote the following letter to J. F. Warren, Resident Engineer:

"Mr. J. F. Warren
Resident Engineer
State Highway Commission
P. O. Box 12153
Charlotte, North Carolina 28205

Re: Construction Conference of March 26, 1968
     N. C. Project 8.1654707-etc.—Mecklenburg County

Dear Sir:

Subsequent to the above conference, we have redoubled our efforts toward drying this soil. We have, as your records will hear out, exhausted every practical resource and are yet not even close to drying this unusual material anywhere near rapidly enough to allow us to prosecute this job to a practical conclusion. We would like to reiterate that this material has been shown to successfully resist even extreme practical methods to dry it out to optimum moisture; therefore, we will, under present circumstances, be forced to present a claim in this connection in the future based on an engineering impracticability.

In the interest of a workable solution we have investigated the use of hydrated lime to dry and possibly improve the soil. The use of this material in an appropriate quantity and manner throughout the work could give us a workable situation. If after your investigation, this special treatment is indicated, we offer to place this material in the fill according to standard practices listed for lime modification of subgrade material in the Lime Stabilization Construction Manual at a price of $30.00 per ton in place. In this way, you will be in complete control of the amount of application as well as the scope of the entire operation.

Please advise us as soon as possible if you are in favor of a trial of this method on this basis.

Awaiting your valuable reply we are—

Yours truly,
INLAND BRIDGE CO., INC.
& ROADBUILDERS, INC.
s/ Fred Triplett

cc. Roadbuilders—Greenville & Bosperity"

Bridge Co. v. Highway Comm.

There was a construction conference on 8 May 1968 and on 14 May 1968. Warren replied to the defendant that the State was investigating the use of lime.

On 27 May 1968, Triplett wrote the following letter to John Davis, Assistant Chief Engineer, Construction & Maintenance in Raleigh:

"Mr. John Davis
Assistant Chief Engineer Construction & Maintenance
North Carolina Highway Commission
Raleigh, North Carolina

Re: N.C. Project 8.1654707—etc.
    Mecklenburg County

Dear Sir.

*We doubled and redoubled our efforts to dry this soil on something akin to a production basis to no apparent avail.* In fact, we have not been able to dry one spot anywhere to optimum moisture. We believe that the inherent moisture of this soil (up to 50%) coupled with its extreme capillarity and affinity for water makes it impractical from an engineering standpoint to dry to anywhere near optimum moisture or compact to 95% density. *We respectfully request, therefore; that this material be classified as unsuitable material and we be allowed to waste it.*

If this remedy does not seem entirely practical to you, we are, of course, amenable to any alternatives you may suggest which will, in fact, afford us to complete this work satisfactorily to us both.

Please advise when we may meet with you in order to persue (sic) this matter toward a sensible conclusion.

                        Yours truly,
                        Fred A. Triplett, Jr.

T/c
cc: Mr. J. M. Warren
    Mr. Arthur L. Gaston
    Mr. Vernon Epting"

On 6 June 1968, the results of tests conducted by defendant indicated that it would be beneficial to use lime to stabilize

the soil. Subsequently, an "Extra Work Order" was entered between plaintiffs and defendant. In addition to agreeing as to payment for the cost of liming the soil, defendant subsequently agreed to extend the time for completion of the project and reduced the compaction requirement to 90%. The work was completed in April 1969. On 25 August 1969, Triplett wrote to T. W. Funderburk, Resident Engineer, wherein he stated that: "We plan to present a claim pertaining to the roadway excavation item as soon as we can complete proper documentation." It was stipulated prior to trial that plaintiffs proceeded according to statute in subsequently presenting the claim.

The discussion of other evidence will appear as necessary in the opinion.

At the conclusion of plaintiffs' evidence, defendant moved to dismiss. Judge Bailey granted the motion, finding and concluding that the conditions at the site were substantially as represented by defendant in the contract and that defendant did not mislead plaintiffs into submitting a low bid. Moreover, he found that plaintiffs did not comply with the contract provisions for obtaining additional compensation by reason of any alleged material change in the site conditions. From judgment entered that plaintiffs' action be dismissed, plaintiffs appealed.

*Eugene L. Brantly and Jordan, Morris and Hoke by Joseph E. Wall for plaintiff appellants.*

*Attorney General Edmisten by Special Deputy Attorney General Eugene A. Smith and Associate Attorney Robert W. Kaylor for the State.*

HEDRICK, Judge.

Plaintiffs assign as error the granting of defendant's motion for dismissal. Under Rule 41(b) in a trial without a jury, the trial judge does not consider the evidence in the light most favorable to the plaintiff. Instead, he must consider and weigh all the competent evidence before him, passing upon the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn therefrom. The trial court must make findings and conclusions in support of his order; and where the findings are clearly supported by the evidence, they are binding on appeal. *Helms v. Rea*, 282 N.C. 610, 194 S.E. 2d 1 (1973); G.S. 1A-1, Rules 41(b) and 52(a).

[1]  In the present case, plaintiffs have excepted to numerous findings and to every conclusion made by the trial court. We have examined the exceptions to the findings of fact and find them to be without merit. In particular, the court found the following:

"(19) The plaintiffs, prior to bidding on the project, requested from and received subsurface information made available by the defendant.

(20) The subsurface information furnished plaintiffs, Exhibit D-8(2), contained information relative to the composition and moisture of the soil to be encountered in the construction of the project. Defendant's Exhibit D-8(2), shows the results of ten moisture tests taken by defendant's personnel in December, 1966. The natural moisture content as indicated in each of the samples was as follows: 29.4%, 31.6%, 33.5%, 34%, 35.3%, 36.8%, 39.1%, 39.2%, 40.5%, and 43.3%.

(21) Section 2.5 of the Standard Specifications, entitled EXAMINATION OF PLANS, SPECIFICATIONS, AND SITE WORK provides as follows: 'The bidder is required to examine carefully the site of the proposed work, proposal, plans, specifications, and contract forms before submitting a proposal. It is mutually agreed that submission of bids shall be considered prima facie evidence that the bidder has made such examinations and is satisfied as to the conditions to be encountered in performing the work, and as to the requirements of the plans, specifications, supplemental specifications, special provisions, and contract.'

(22) The plaintiffs made a visual inspection of the site prior to submitting a bid; however, the plaintiffs made no borings, tests, or other examinations of the material in the cut sections of the project to determine the composition of the soil or the existing moisture content.

        *    *    *

(26) The project began at Survey Station 396± and terminated at Station 515±. The material between Station 396 and 425 had a high moisture content which was difficult to reduce to optimum moisture. The composition of some of the material shown in the subsurface information indicated the material was marginal for use in the con-

struction of roadway embankments. Project plans provided for the excavation material to be used in embankment sections on this project 3 feet below the subgrade of the finished roadway.

(27) The defendant warned prospective bidders that the material to be taken from the cut section between Stations 396 and 415 contained a high percentage of moisture, which placed the bidders on notice of difficulty in excavating and placing the material in embankments. The information made available to plaintiffs prior to bidding concerning the soil composition was such that based solely upon that information the plaintiffs' expert witness, Professor Kenneth Humphries, was of the opinion that it was unstable, difficult to dry and compact, and its use in the embankment was an 'engineering impracticability'.

(28) Plaintiffs presented no credible evidence that the composition of the soil was misrepresented by the contract documents.

\* \* \*

(51) Plaintiffs produced no credible evidence that the 'unclassified excavation' taken from the cut section on the project was in fact unsuitable for embankment construction of the project as called for in this contract. All material classified and paid for as 'unclassified excavation' was classified and paid for in accordance with contract provisions.

\* \* \*

(53) The material to be taken from the cut section on the project, and classified as unclassified excavation, was acceptable for embankment construction.

\* \* \*

(56) The Court finds that the conditions at the site encountered by the contractor were substantially the same as represented by defendant in the contract documents and that the defendant did not mislead or deceive the contractor into submitting a low bid by reason of any difference between the conditions represented by defendant and those actually encountered by the plaintiffs on the project."

Each of these findings is clearly supported by the evidence. Together they support the conclusion that defendant did not

misrepresent the condition of the unclassified material which was used at the project site.

Plaintiffs have excepted to the following conclusions made by Judge Bailey:

"(1) The plaintiff is not entitled to any additional compensation by reason of the reclassification of the soil due to the failure of the plaintiff to file a claim with the State Highway Administrator before filing suit in the Superior Court as required by G.S. 136-29.

(2) The contractor, having filed a claim with the State Highway Administrator alleging 'misrepresentation of the moisture content of the soil', and the court having found as a fact that there was no material misrepresentation and that as the terms and provisions of the contract do not provide additional compensation to the contractor for increased cost by reason of misrepresentation, the plaintiffs' claim based on 'misrepresentation of the moisture content of the soil', is hereby dismissed."

[2] Plaintiffs contend strenuously that they were not bound by the claim filed with the State Highway Administrator since G.S. 136-29 clearly provides for a *de novo* trial in the superior court. They argue that they are not estopped from developing additional theories of recovery in the superior court. This contention is without merit. In *Teer Co. v. Highway Commission*, 265 N.C. 1, 143 S.E. 2d 247 (1965), the Supreme Court made it clear that the Commission is not subject to suit except in the manner provided by statute. Plaintiffs' whole claim before the Commission was for misrepresentation. Had they desired to sue under the provisions in the SSRS incorporated into the contract, which provides for claims based on changed conditions, extra work, or reclassification of materials, it was necessary for them to elect to do so prior to the trial in the Superior Court. *Construction Co. v. Highway Comm.*, 28 N.C. App. 593, 222 S.E. 2d 452 (1976).

[3] Moreover, G.S. 136-29 has been interpreted to provide for recovery only within the terms and framework of the contract. *Teer Co. v. Highway Commission*, 4 N.C. App. 126, 166 S.E. 2d 705 (1969). The evidence introduced at trial shows clearly that plaintiffs did not make any formal protest to defendant until they wrote defendants on 6 May 1968. Subsequent to the mail-

ing of that letter, plaintiffs and defendant entered into negotiations and executed an extra work order which was agreeable to both sides. Prior to 6 May 1968, plaintiffs did not formally protest in the manner provided for in the contract provisions. SSRS § 4.3A requires notice in writing to the Engineer where the contractor believes he has encountered changed conditions. SSRS 4.4(B) requires a written request for a modification in the contract and the issuance of an extra work order. SSRS § 22-3.8 provides that a protest of the classification made by the engineer must be made in writing.

Even assuming that plaintiffs could develop alternative theories of recovery at the trial level, the evidence shows clearly that they failed to proceed in the manner provided by the contract.

Judge Bailey made detailed findings with respect to the failure of the plaintiffs to notify defendant in accordance with the contract and to the failure of plaintiffs to keep force account records as required by the contract. These findings are amply supported by plaintiffs' own evidence. Indeed there is no exception to the court's finding "that the contractor did not keep cost records as required by Section 4.3A of the Standard Specifications and 9.4 of the Standard Specifications on force account work."

"Strict compliance with the contract provisions . . . is a vital prerequisite for the recovery of additional compensation based on altered work, changed conditions, or extra work." *Construction Co. v. Highway Comm.*, 28 N.C. App. at 606-607, 222 S.E. 2d at 461. The findings support the conclusion that:

> "[T]he plaintiffs are not entitled to recover any additional compensation for extra work by reason of the failure of plaintiffs to comply with the terms and provisions of the contract for obtaining addtiional compensation as a result of any alleged extra work."

The order appealed from is

Affirmed.

Judges BRITT and MARTIN concur.