**JOSEPH PICKARD'S SONS COMPANY**

v.

**The UNITED STATES.**

**No. 184-74.**

United States Court of Claims.

April 14, 1976.

Daniel M. Ross, Chevy Chase, Md., attorney of record, for plaintiff; Glade F. Flake and Peter S. Latham, Washington, D.C., of counsel.

Marc J. Fink, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant.

Before DAVIS, SKELTON and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on defendant's motion, filed January 6, 1976, moving that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge George Willi, filed November 24, 1975, pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment since plaintiff has failed to file a request for review thereof by the court and the time for so filing under the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby grants defendant's said motion and affirms and adopts the recommended decision as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is denied, defendant's mo-

tion for summary judgment is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

WILLI, Trial Judge:

Plaintiff brings this suit to attack the validity, according to Wunderlich Act[1] standards, of one facet of an April 24, 1973 decision by the Armed Services Board of Contract Appeals (the Board) denying recovery of costs allegedly attributable to delay caused by the issuance of a change order dealing with welding specifications in a supply contract for an improved type of prefabricated landing mat for aircraft. *Joseph Pickard's Sons Co.*, 73–1 BCA ¶ 10,026. Plaintiff takes no exception to the allowance approved by the Board for the direct costs that it claimed in respect to the change. Similarly, it does not challenge any of the subsidiary factual determinations made by the Board concerning the delay claim; only the Board's ultimate conclusion that the change was not sufficiently shown to have caused the delay costs for which compensation is sought.

Plaintiff, a first-time Government prime contractor, is otherwise a Philadelphia-based manufacturer of pile wire and brazed die needles used in the fabrication of rugs, carpets, canvas and other heavy textile items.

On September 2, 1965, after a period of successful research and experimentation by the Army, the Defense Construction Supply Center issued an invitation for bids on a contract to supply a new type of steel landing mat for aircraft. A major improvement was the elimination of the round perforations that characterized the mats of World War II, permitting particles of surface dirt to rise and contaminate the moving parts of aircraft traversing them.

As the low responsible bidder, plaintiff was awarded a contract on October 19, 1965 for 38,336 13-member bundles of landing mat at a total price of $9,109,783.68. The contract contained standard Disputes and Changes clauses and also extended the Government a 100 percent option quantity at the same unit price. On October 28, 1965, that option was exercised so that the contract to be performed called for 79,762 bundles of mats to be delivered from March through October 1966 at a price of $18,105,-326.08.

Plaintiff elected to perform its contract in a separate facility that it appropriated exclusively to that use. Promptly after receiving the award plaintiff set about establishing a high-volume production line in the specialized facility. It experienced various difficulties in perfecting the line and consequently produced no mats for delivery until late March 1966. Production problems persisted so that, as against a contract completion date of October 1966, by December 31, 1966 plaintiff had delivered less than one-third of its total contractual commitment. The completion date was ultimately extended by agreement and performance eventually completed in May of 1968.

As soon as plaintiff's deliveries began, its mats, together with those of others suppliers, were promptly shipped to Vietnam and put in service there. The overseas using activities shortly notified the procuring authorities that the mats generally, including those supplied by plaintiff, presented so many burrs and sharp edges that excessive aircraft tire wear was resulting.

After study and investigation of the problem, the procuring authorities concluded that faulty welding was a principal source of the difficulties encountered in the field. To remedy the situation they decided to replace the general "good commercial practice" welding workmanship standard of the contract specifications with a set of considerably more detailed requirements, including one that called for a 4,000 pound static pressure test of any coverplates deemed suspect on visual inspection. Promulgation of the new requirements was first attempted by way of an October 14, 1966 letter from the Contracting Officer to the plaintiff. The letter characterized the detailed welding criteria spelled out in it as

1. 41 U.S.C. §§ 321–22 (1970).

only clarifying rather than enlarging the original contract specifications. When plaintiff received the letter it promptly demurred, insisting that the new welding instructions did indeed increase the stringency of the specifications and adding that compliance with them would consequently entail additional costs. Plaintiff therefore requested that the new directives be instituted by a formal change order rather than by letter. This was done by a contract modification issued October 31, 1966. Plaintiff thereupon requested that the effective date of the modification be deferred until November 21, 1966 so that it could acclimate its personnel and operations to what it regarded as the new and different ground rules defining acceptable welding. Its request was granted and the modification implemented accordingly.

The Board agreed with the plaintiff that the supplementary welding requirements changed the contract's specifications in a manner that increase both the labor and material costs of welding. It therefore awarded plaintiff an equitable adjustment of $124,001.88 on those accounts.

 In addition, plaintiff claimed that it was due $851,418.54 to compensate it for decreased productivity (and resultant delay in contract completion) measured by the increase in end-product rejections that it contended must have been attributable to the more demanding welding requirements imposed by the change order. The proposed damage figure consisted of that portion of plaintiff's total 1967[2] production costs represented by the difference between the percentage relationship of rejects to total production before the change order and after. A representative of the Defense Contract Audit Administration (DCAA) verified the essential correctness of the fact, but not the alleged cause, of the relative increase in average rejection rate and average decrease in weekly production. The Board denied the claim for want of any direct proof associating identifiable added costs with production delays resulting from the new welding requirements. The DCAA audit verification of plaintiff's production and rejection figures did not, of course, amount to an admission of Government responsibility for decreased productivity. *Boyajian v. United States*, 423 F.2d 1231, 1239, 191 Ct.Cl. 233, 247 (1970).

Addressing plaintiff's statistical presentation, indicating that on an overall average basis its rate of rejections was measurably greater after the change order than before, the Board made several points. First, it called attention to various discrepancies and inconsistencies in the several editions of statistical data proffered by plaintiff to substantiate a post-change order increase in rejection rate. Second, it pointed to undisputed facts showing that there was no consistent correlation between volume of production and quantity of rejections when compared on a monthly basis, thereby undermining any inference that decreased production was attributable to increased rejections. Finally, it referred to the Government's evidence affirmatively showing a number of different causes of reduced production after the change order, all of which were apparently unrelated to it. The Board observed that plaintiff had not attempted to show that the frequency and nature of these post-change order difficulties were comparable to those experienced theretofore.

Turning to the question of damages, the Board found inexcusable plaintiff's failure to adduce any direct evidence of increased costs resulting from delay caused by the change order. It recalled that plaintiff had resisted the substance of the change order when first proposed and had expressly forecast that imposition of the revised standards that were in contemplation would increase performance costs. Moreover, it had secured a 3-week moratorium on enforcement of the order after its issuance in order to prepare for operations under it. In those circumstances the Board found fatally

---

2. Plaintiff excludes 1968 performance costs from its calculations because the parties had agreed administratively to a production stretchout in 1968 at no additional cost to the Government.

defective plaintiff's acknowledged failure to assemble any evidence directly connecting decreased production efficiency and consequent cost increases with differences between the original and supplementary welding standards. That failure, it is parenthetically noted, becomes even more telling when considered in light of the fact that throughout performance plaintiff operated with a product inspection force that was twice as large as it had planned and for which the Board allowed it additional compensation of $133,633.73. Thus fortified with inspection personnel, it would seem that plaintiff could readily have documented the details of those post-change order rejections that would have passed muster under the superseded specifications, as well as the time and added cost of remedying the defects involved.

The Board summarized its conclusion on the claim in suit as follows (73–1 BCA at 47,075):

> We do not deny that there may have been some production loss as a result of * * * [the change order]. However we conclude that the appellant has failed to present any evidence which would reasonably establish that the costs claimed are in whole or in part attributable to that * * * [change order]. A statistical circumstantial presentation supported by allegations does not constitute proof. The appellant has failed to show a causal connection between the amounts claimed and the alleged cause.

To upset the Board's decision plaintiff first repeats the same *res ipsa loquitur*-like theory of contract liability that it urged there. It therefore contends that the undisputed post-change order increase in rejection rate was enough to make out a *prima facie* case of liability. The Board acknowledged as much, plaintiff says, in the first sentence of the language from its decision, quoted above. Plaintiff also discounts the rebuttal significance, on its *prima facie* case, of the affirmative evidence of post-change order production interruptions caused by factors totally extrinsic to the revised welding specifications by pointing out that the Government failed to prove that pre-change order production was not similarly inhibited.

Treating liability as thus established, plaintiff then proceeds to justify its general approximation of damages, not by undertaking to explain its inability to produce any evidence of actual damage from delay but by expansively invoking the maxim that where liability is established "absolute certainty or precise mathematical accuracy" is not an invariable prerequisite to a damage award. *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 729 (1964) and cases cited therein. In short, plaintiff says that because liability was shown, it was entitled to receive a so-called "jury verdict" type of damage award from the Board.

Though defendant suggests at the outset that plaintiff should fail in any event because the damages that it seeks are of the generally disfavored "total cost" variety,[3] a holding on that ground (which plaintiff disputes) is unnecessary because whatever the case in that regard the inescapable fallacy in plaintiff's position on proof of damages is the presupposition that in a contract dispute the general requirement that the amount of a damage award be supported by direct proof of loss is displaced by a bare showing that the contract has definitely been breached.

While it is true that a clear showing of liability is indispensable to a recovery, it is equally well-settled that the amount of the recovery can only be approximated in the format of a "jury verdict" where the claimant can demonstrate a justifiable inability to substantiate the amount of his resultant injury by direct and specific proof; something that, according to the Board's unchallenged factual determinations, was not done here.

It appears that this court first approved a jury verdict measure of damages in *Needles*

---

3. *Boyajian v. United States*, 423 F.2d 1231, 1238–39, 191 Ct.Cl. 233, 245 (1970), and cases cited therein.

*v. United States*, 101 Ct.Cl. 535 (1944), a contract case involving a series of manifest Government breaches that culminated in a wrongful termination by it. For the proposition that where liability is so clearly established absolute certainty in the measure of damages is not always required, the court relied on *Eastman Kodak Co. v. Southern Photo Material Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), and *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).[4] Significantly, the court particularly cited the following language from *Story, supra* (at 562–63, 51 S.Ct. at 250–51, 75 L.Ed. at 548):

> Upon a consideration of the evidence, we are of opinion that it was open to the jury to find that the price cutting and the resulting lower prices were directly attributable to the unlawful combination; and that the assumption indulged by the court below, that respondents' acts would have been the same if they had been acting independently of one another, with the same resulting curtailment of prices, must be rejected as unsound.
>
> Nor can we accept the view of that court that the verdict of the jury, in so far as it included damages for the first item, cannot stand because it was based upon mere speculation and conjecture. This characterization of the basis for the verdict is unwarranted. It is true that *there was uncertainty as to the extent of the damage, but there was none as to the fact of damage;* and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. *The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong*, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. *Taylor v. Bradley*, 39 N.Y. 129, 4 Abb.Ct.App. (N.Y.) 363, 366–367:

> "It is sometimes said that speculative damages cannot be recovered, because the amount is uncertain; but such remarks will generally be found applicable to such damages as it is uncertain whether sustained at all from the breach. Sometimes the claim is rejected as being too remote. This is another mode of saying that it is uncertain whether such damages resulted necessarily and immediately from the breach complained of.

> "The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain. The latter description embraces, as I think, such only as are not the certain result of the breach, and does not embrace such as are the certain result, but uncertain in amount."

*Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty*, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. *In such case*, while the damages may not be determined by mere speculation or guess, *it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.* *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684. Compare *The Seven Brothers*, (D.C.) 170 F. 126, 128; *Pacific Whaling Co. v. Packers' Assn.*, 138 Cal. 632, 638, 72 P. 161. As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party. *Allison v. Chandler*, 11 Mich. 542, 550–556. [Emphasis added.]

---

4. 101 Ct.Cl. at 619.

744

In *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), a case, like *Eastman* and *Story Parchment* before it, involving a challenge to a jury's approximation of civil damages flowing from antitrust violations, the Court again approved such an award in appropriate circumstances and in so doing reemphasized the twin requirements that such circumstances must include an unmistakable showing (1) that a legal injury has occurred and (2) that for reasons beyond its control, typically the conduct of the defendant, the claimant was prevented from specifically proving its damages. 327 U.S. at 263–66, 66 S.Ct. at 579–81, 90 L.Ed. at 659–61.

More recently the Court has again made clear that relaxation of the requirement that an injured party support his damage claim with definite and specific proof may be countenanced only where such proof is not reasonably available to him. Thus, in *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 148 (1969), another civil antitrust damage suit where a jury's approximation was approved, it said: "Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; *damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."* (Emphasis added.) *See also Simon v. New Haven Board & Carton Co.,* 516 F.2d 303, 306 (2d Cir. 1975).

In asking for damages measured by a fraction of total 1967 production costs the plaintiff has offered neither the Board nor this court any explanation, much less justification for its total failure to present direct proof of additional costs that resulted from delay stemming from the change order dealing with welding. Certainly there was nothing inherent in the change order action, of which plaintiff had ample advance notice, that would realistically have prevented it from assembling such proof. Clear and consistent Supreme Court doctrine requires that plaintiff's claim be denied for lack of adequate proof of damage.

## CONCLUSION

For the reasons given, plaintiff's motion for summary judgment is denied, defendant's motion for summary judgment is granted, and the petition is dismissed.

