696 P.2d 203

**NEW PUEBLO CONSTRUCTORS, INC.,**
**Plaintiff/Appellee,**

v.

**STATE of Arizona,**
**Defendant/Appellant.**

**No. 2 CA–CIV 4734.**

Court of Appeals of Arizona,
Division 2.

March 7, 1984.

Lewis & Roca by John P. Frank, Joseph E. McGarry and Sarah H. Jenkins, Phoenix, for plaintiff/appellee.

Robert K. Corbin, Atty. Gen. by James L. Hohnbaum, Joe Acosta, Jr. and Albert Morgan, Asst. Attys. Gen., Phoenix, for defendant/appellant.

## OPINION

HOWARD, Judge.

This action arises out of two contracts between the State of Arizona through the Arizona Department of Transportation (ADOT) and New Pueblo Constructors, Inc. (NPC) for the construction of a portion of the interstate freeway in Santa Cruz County, Arizona. The state appeals from a jury verdict against it in the sum of $256,891.28.

The facts considered in the light most favorable to upholding the verdict are as follows. The parties entered into two contracts for the construction of a part of the interstate freeway, one for the section known as I–19–1(25) (Carmen project) on September 21, 1976, and one for the section known as I–19–1(29) (Tubac project) on February 4, 1977. The work in both segments consisted of grading, draining, furnishing and placing base and surfacing materials, and other work incidental to the construction of each segment. Incorporated as a part of the contracts was the Arizona Department of Transportation Standard

Specifications for road and bridge construction, ediction of 1969 and 1977 supplement thereto. (Standard Specifications).

The base materials, called "select" materials, consist of rock of specified size which is placed on the grade and compacted to form the base course. The surface or paving course is made by mixing various sizes of rock and sand, called mineral aggregate, with asphalt, which is spread and rolled over the base course.

Both contracts, as well as custom and practice in the highway construction trade, recognized three sources for furnishing aggregate material: state-furnished sources, contractor-furnished sources, and commercial sources. In each instance the contractor is responsible for paying for the material. Both contracts, when bid, provided for state-furnished sources for obtaining select materials and mineral aggregate. If a contractor-furnished source is substituted for the state-furnished source, the parties enter into a change order or supplemental agreement which incorporates the contractor-furnished source and the other terms of the original agreement into the contract. Since the principal state-furnished source of select material for both projects was located in the center of the Santa Cruz River, NPC with the consent of ADOT substituted a source known as the Anamax pit. This substituted pit was located in an area less prone to flooding and provided a higher quality material. Substitution of a contractor-furnished source for mineral aggregate on the common project was also agreed to. In the same manner, the Agua Linda pit was substituted for select material on the Tubac project and was made a source of mineral aggregate for both projects.

On October 9 and 10, 1977, an extraordinary storm, part of Hurricane Heather, hit southern Arizona. The result was a 100-year storm, causing the biggest runoff and flood experienced in the area for the last 43 years and causing damage to the work and the area around of the project. Due to the heavy rains and floodwaters, the governor of the State of Arizona declared a state of emergency for Pinal, Pima and Santa Cruz counties.

As a result of the October 1977 storm, the aquifer was recharged and the groundwater level was raised. This condition was aggravated by heavy rains in January, February and March of 1978 which caused the groundwater level to rise and affected the groundwater table in the Agua Linda pit.

The weather events and action of the elements caused extensive damage and injury to the project area and the work previously performed by NPC. The soil in the project area became unstable; the subsurface became so soft that heavy construction equipment sank in mudholes fed by groundwater; select material previously placed on the roadway became over-saturated and had to be removed and replaced; cut slopes eroded into the borrow ditches; stockpiled select material in the Anamax pit and special backfill material eroded and washed away; the subgrade, the surface on which the road which was to be constructed, was eroded and softened; the natural ground was saturated and had to be stabilized, and the roadway refilled; the groundwater table in the Agua Linda pit ultimately rose from a level of 30 to 12 feet below the surface and a new section of the pit had to be developed for mineral aggregate and additional select materials had to be excavated, crushed and hauled.

During December of 1977, ADOT was made aware and had actual knowledge of the adverse and continuing effects of weather upon the project. In fact, at ADOT's request the Santa Cruz River Basin including the project site, was declared a major disaster area by the federal government on November 4, 1977.

In mid-March or early April 1978 Karl Ronstadt, NPC's president, and Kyrk Reid, NPC's vice-president, met with the state engineer, Oscar Lyons, and discussed the expenses which NPC was incurring and would be incurring in order to repair the damage to the work. Mr. Lyons suggested that NPC file a claim under subsection 107.17 of the Standards Specifications. This subsection provided, in part:

"Until final written acceptance of the project by the engineer, the contractor shall have the charge and care thereof and shall take every precaution against injury or damage to any part thereof by the action of the elements or from any other cause, whether arising from the execution or from the nonexecution of the work. The contractor shall rebuild, repair, restore and make good all injury or damages to any portion of the work occasioned by any of the above causes before final acceptance and shall bear the expense thereof *except damage to the work due to unforseeable [sic] causes beyond the control of and without the fault or negligence of the contractor, including but not restricted to acts of God,* of the public enemy or governmental authorities." (emphasis added)

By letter dated March 16, 1978, NPC advised ADOT:

"We have experienced more than normal stoppage of work on the above-referenced project due to weather during the last six months. There was heavy rain and flooding in October, 1977, and unseasonable rains during December, 1977 and January, February and March of 1978. Operations in our aggregate and select pits and special backfill areas have been hampered by a rising water table and continuous flooding of the Santa Cruz River.

The weather stoppage as recorded by ADOT's reports may not show the far-reaching effect of the abnormal weather trend we have just experienced. We may have other delays that can be directly or indirectly associated with these conditions which would impede the timely completion of this project.

Therefore, please consider this notification of potential delay as a result of the above-mentioned weather."

By letter of April 20, 1978, NPC again called to ADOT's attention the causes of the damage to the work on the project. ADOT was informed in that letter that data was being compiled and assessed to determine the cost of the damage to the work and the financial impact of the time delays associated with the damage.

Upon receipt of NPC's letters of March 16 and April 20, ADOT sent the following letter to NPC:

"YOUR LETTER OF APRIL 20, 1978, IS RECEIVED AND DUELY [sic] NOTED. SINCE THE INFORMATION PRESENTED IN YOUR LETTER DOES NOT CONSTITUTE PROPER BASIS FOR CLAIM AS REQUIRED UNDER STANDARD SPECIFICATION SECTION 105.17, I WILL NOT FEEL OBLIGED TO MAINTAIN FORCE ACCOUNT BASIS ON ANY OPERATIONS DUE TO THIS LETTER.

WITHOUT DETAILED INFORMATION ON THE LOSSES YOU ARE CLAIMING, IT WILL SERVE NO PURPOSE AT THIS TIME TO DISCUSS THE SAME.

WHEN ADDITIONAL INFORMATION IS RECEIVED IT WILL BE CAREFULLY EXAMINED AND ANSWERED."

In response to this last letter, NPC, on May 4 sent a letter telling the engineer that it intended to press its claims and asking him to keep time on the fence work and the remaining roadway excavation. (Neither of these items was involved in the claims in this litigation.)

On June 27, 1978, although not all of the cost to repair, rebuild and make good the damage had yet been incurred, NPC submitted a summary and estimate of its claims and the cost to ADOT. NPC thereafter continued with performance and work on both projects, including the work to rebuild, repair, replace and make good on injured work. The Carmen project was completed and accepted by ADOT in early August 1978.

May 24, 1979, was the revised completion date for the Tubac segment. Sixteen days before the extended completion date, traffic was turned onto the main highway portion of the Tubac project. Six days before the deadline, all construction items under NPC's direct control were completed. There were no detours nor hindered traffic

flow. ADOT had full access to and use of the roadway, and the Tubac segment was in a safe condition convenient for the use of the traveling public. Nevertheless, NPC was assessed $31,500 in liquidated damages by ADOT because of certain items which remained incomplete, mainly related to the frontage road. The damage was calculated as 75 days after May 24, 1979, at the rate of $420 per day. Although the Tubac contract provided for liquidated damages for time overruns, it also called for granting an extension of time if the work was delayed because of conditions beyond the control and without the fault of the contractor. The contract also provided that ADOT could waive liquidated damages for that portion assessed after the work was safe and convenient for public use.

The claim submitted by NPC to ADOT on June 27, 1978, estimated the cost to rebuild, repair and make good on the damaged work at $490,614. ADOT required that NPC follow a multi-level claim presentation procedure. ADOT's senior engineer at the project level denied NPC's claims on September 11, 1978. NPC requested a review by the district engineer in Tucson, and its claims were then denied at the district level. On or about December 26, 1978, the state engineer designated an informal review board to sit on his behalf to make recommendations on NPC's claims. A hearing was held before the ADOT review board on April 24, 1979. At the outset of this latter hearing, NPC withdrew and deleted those items which it felt were not originally within the scope of subsection 107.17, reducing its claim to $346,000. The state engineer's final conclusion was that ADOT had no liability except for replacing the stockpiled select material lost in the Anamax pit as a result of the flooding.

A similar ladder of hearings and appeals was initiated by NPC on its claim for remission of the liquidated damages. The state engineer ruled on March 19, 1980, that NPC was not entitled to remission or a waiver of the liquidated damages.

Having exhausted all of its administrative remedies on both claims, NPC filed its complaint in Santa Cruz County Superior Court on May 5, 1980, seeking to recover costs and expenses incurred for repairing, rebuilding, restoring and making good the work on both projects and also to recover the liquidated damages assessed on the Tubac contract.

During the course of the trial, the court ruled and later instructed the jury that NPC could not recover for any of its costs and expenses to rebuild, repair, restore and make good which were incurred prior to either March 16 or April 20, 1978, when NPC first gave written notice of intent to file a claim. The court also ruled, as a matter of law, that the jury could not consider three of NPC's claim items which had not previously been submitted to the state engineer.

The jury found that NPC was entitled to recover $225,361.28 under Count I of its complaint, representing the following costs: cleaning and refurbishing medians and ditches, $3,540; dewatering of the mineral aggregate (Duval or Agua Linda pit), $39,-856.66; replacement of eroded material in Anamax pit lost in flood, including cost of hauling substitute material from Duval pit to Anamax pit, $28,544.10; restoring and making good on eroded and lost special backfill material, $7,874.76; additional stripping of Duval mineral aggregate pit, $19,090; and restoring and making mineral aggregate for both projects from new area after flooding of Agua Linda pit, $102,098. The jury also found that NPC was entitled to recover 12.133 per cent overhead costs (without profit) on the subsection 107.17 expenses or the overhead amount of $24,-387.76.

The court instructed the jury that the test to be applied by the jury in passing on the liquidated damage claim was whether the state engineer had been arbitrary or capricious in his failure to waive or remit the liquidated damages on the Tubac project. The jury found against ADOT and assessed damages in the sum of $31,500. NPC was also awarded reasonable attorney's fees under A.R.S. § 12–348 in the

sum of $42,192 and expert witness fees in the sum of $17,792.94.

Appellant contends the trial court erred in denying its motion for directed verdict at the close of all the evidence (1) because the rains of December 1977 through March 1978 did not constitute an "act of God"; (2) because the contractor's mineral sources were not part of the "work"; (3) because the contractor did not comply with the notice requirement of Standard Specifications subsection 105.17, and (4) because the action was barred by the statute of limitations. Appellant further contends the court erred as follows: (1) admitting evidence of the excess of actual costs over expected costs as a measure of damages; (2) allowing Donald Riggs to testify as an expert; (3) excluding reference to the decision of the state engineer; (4) submitting the issue of liquidated damages to the jury; (5) awarding attorney's fees and expert witness fees, pursuant to A.R.S. § 12–348, and (6) awarding costs to the contractor.

## THE STATUTE OF LIMITATIONS

■ The first issue is whether NPC's claims were barred by A.R.S. § 12–822, which provides that an action against the state on a contract claim must be commenced within two years after the cause of action accrues. The complaint alleged and the evidence shows that the damages were incurred between October 1977 and March 1978. Since the complaint was not filed until March 1980, ADOT contends the claims were barred. We do not agree.

A.R.S. § 12–821 provides:

"Persons having claims on contract or for negligence against the state, *which have been disallowed,* may on the terms and conditions set forth in this article, bring action thereon against the state and prosecute the action to final judgment." (Emphasis added)

Since the cause of action here did not accrue until the claims were disallowed, NPC's complaint was timely filed. See *Grimm v. Arizona Board of Pardons and Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977); *State v. Brooks,* 23 Ariz.App. 463,

534 P.2d 271 (1975). The case of *Mammo v. State,* 138 Ariz. 528, 675 P.2d 1347 (1983), cited by ADOT, does not hold otherwise. It merely holds that the state's answering of a complaint filed in the superior court constituted a constructive disallowance of the claim.

## ACT OF GOD—UNFORESEEABILITY

■ Subsection 107.17 of the specifications makes the contractor liable for all damage to the work but makes an exception for "... damage to the work due to unforseeable [sic] causes beyond the control of and without the fault or negligence of the contractor, including but not restricted to acts of God...." The question was, therefore, not whether the damage was caused by an "act of God," but whether it was the result of unforeseeable causes beyond the control of and without the fault or negligence of the contractor.

Karl Ronstadt, NPC's president, testified that he had never in all of his contracting experience in New Mexico and Arizona, experienced as much rainfall as in the winter of 1977 and 1978. He also testified that the Santa Cruz River, in the spring of 1978, flowed more and higher than he had ever seen in his lifetime. John R. Erickson, a water research engineer, testified:

"A. ... I don't think anyone could have foreseen that there would be enough recharging groundwater coming out of that upper basin, both above Nogales and in the stream, in the tributary areas to have caused the entire basin below Nogales to become recharged to the point where it maintained high levels for a period of time.

\* \* \* \* \* \*

Q. What were those opinions [hydrological opinions with respect to the hydrological events in the Agua Linda pit]?

A. Well, I don't think it could have been foreseen that first you would have the very high rainfall events and then the sequence between November, 1977 and February, March, 1978 adding to the very extreme condition of November, of

October, 1977 and the buildup of the groundwater that would cause the water levels to remain high in the area of the Agua Linda pit as long as they did."

Oscar Lyons, the state engineer during the contract period, acknowledged that the flooding was greater than a 100-year flood. Alex Durazo, a former ADOT employee who worked in the Nogales area for 31 years, testified that the storm was exceptional and that he had never seen one like it before in the area. ADOT's own expert hydrologist, Mr. Halpenny, stated that the runoff of the storm of October 1977 was the biggest flood in his 43-year experience in that valley area. He categorized the event as a 100-year rain and runoff event.

ADOT offered testimony that this extraordinary event was foreseeable. The trial court instructed the jury as follows:

"If you find that the weather conditions and the actions of the elements which I have described were unforeseeable, then without the fault and beyond the control of the contractor, New Pueblo, you must then decide whether New Pueblo incurred any additional costs or expenses as a result."

The jury found the events were unforeseeable. There was clearly substantial evidence to support this conclusion.

## THE WORK

■ ADOT consistently urged the trial court to rule that the contractor-furnished material sources or pits were not part of the "work" as that term is used in subsection 107.17. It contends the trial court erred in denying its motion for a directed verdict as to all items of damage except the cleaning and refurbishing of medians and ditches and in refusing to give defendant's requested instruction No. 15, which read as follows:

"Plaintiff, New Pueblo, may not recover compensation for rebuilding, repairing, restoring or making good done outside of the State's right of way. You may award damages only for the rebuilding, repairing, restoring and making

good done to the roadway and associated areas within the State's right of way."

Instead, the trial court instructed the jury that the material source and pits were considered to be part of the "work."

Section 101 of the Standard Specifications, which were drafted by ADOT, contains definitions and states:

"Wherever in these specifications or in other documents the following terms ... are used, the intent and meaning shall be interpreted as follows:

\*　　\*　　\*　　\*　　\*　　\*

**101.65 Work:**

Work shall mean the furnishing of all labor, *materials*, equipment and other incidentals necessary or convenient to the successful completion of the project *and the carrying out of all the duties and obligations imposed by the contract.*" (Emphasis added.)

The difficulty arises when one tries to fit the definition of subsection 101.65 into the language of subsection 107.17, which seems to be a provision governing destruction or damage to the subject matter of the contract, to wit, the project. However, there is a separate definition of the term "project" in subsection 101.33, which defines it as "[t]he specific section of the highway together with all construction to be performed thereon under the contract." Since both terms are specifically, and differently, defined in the contract, which was drafted by ADOT, we must assume that the use of the word "work" instead of "project" in subsection 107.17 was deliberate. ADOT is therefore bound by its definition of "work" in subsection 101.65. At best, the contract is ambiguous, and the uncontradicted testimony on behalf of NPC was that it is customary in the building trade to include borrow pits and haul roads as part of the "work."

The trial court did not err in concluding that the material source and pits were to be considered as part of the work under the contract.

120

NOTICE

Subsection 105.17 of the Standard Specifications states:

"If for any reason, the contractor deems that additional compensation is due him for work or material not clearly covered in the contract or not ordered by the engineer as extra work, the contractor shall notify the engineer in writing of his intention to make claim for such additional compensation before he begins the work on which he bases the claim. If such notification is not given and the engineer is not afforded proper facilities by the contractor for keeping strict account of actual cost as required, the contractor hereby agrees to waive any claim for such additional compensation. Such notice by the contractor and the fact that the engineer has kept account of the cost as aforesaid, shall not in any way be construed as proving or substantiating the validity of the claim. If the claim, after consideration by the engineer, is found to be just it will be paid for in accordance with the requirements of subsection 109.03. Nothing in this subsection shall be construed as establishing any claim contrary to the terms of subsection 104.02."

Also important is subsection 104.03 which states:

"The contractor shall perform unforseen [sic] work, for which there is no price included in the contract, whenever it is deemed necessary or desirable in order to complete fully the work as contemplated. Such work shall be performed in accordance with the specifications and as directed and will be paid for, in accordance with the requirements of subsection 109.04."

Subsection 109.04 states in part:

"Extra work performed in accordance with the requirements and provisions of subsection 104.03 will be paid for at the unit price or at the lump sum price stipulated in the order authorizing the work or the Department may require the contractor to do such work on a force ac-count basis to be compensated in the following manner:

*    *    *    *    *    *

(5) No payment will be made for work performed on a force account basis until the contractor has furnished the engineer with duplicate itemized statements of the cost of such force account work detailed as follows:

(a) Name, classification, date, daily hours, total hours, rate and extension for each laborer and foreman.

(b) Designation, dates, daily hours, total hours, rental rate and extension for each unit of machinery and equipment.

(c) Quantities of materials, prices and extensions.

(d) Transportation of materials. * * "

ADOT claims that NPC failed to give it proper notice under subsection 105.17 and has therefore waived its claim for additional compensation. NPC contends that its letters of March 16 and April 20 satisfied the requirements of subsection 105.17, that the sufficiency of the notice was a question of fact for the jury and that it was incumbent upon the state under the Standard Specifications to come forward and make arrangements to keep track of the extra work and costs once written notice was given.

■ The provisions of subsection 105.17 of the Standard Specifications are for the benefit of the state. These requirements alert the public agency that the contractor intends to request additional compensation for the reason stated in the notice. It enables the public agency to make an early evaluation of the claim, keep cost records and pay meritorious claims. As stated by the court in *Blankenship Construction Company v. North Carolina State Highway Commission*, 28 N.C.App. 593, 222 S.E.2d 452 (1976):

"... The notice and record-keeping procedures of these provisions are not oppressive or unreasonable; to the contrary, they are dictated by considerations of accountability and sound fiscal policy.

The State should not be obligated to pay a claim for additional compensation unless it is given a reasonable opportunity to insure that the claim is based on accurate determinations of work and costs. The notice and record-keeping requirements constitute reasonable protective measures, and the Contractor's failure to adhere to these requirements is necessarily a bar to recovery for additional compensation." 222 S.E.2d at 462.

In the absence of conduct by the state operating as a waiver or raising an estoppel, the contractor cannot recover unless he follows the written notice requirement of the contract. See *State Highway Department v. Hewitt Contracting Company*, 113 Ga.App. 685, 149 S.E.2d 499 (1966); *Main v. Department of Highways*, 206 Va. 143, 142 S.E.2d 524 (1965); *Rea Construction Company v. State Roads Commission*, 226 Md. 569, 174 A.2d 577 (1961). And see *Thorn Const. Co., Inc. v. Utah Dept. of Transp.*, 598 P.2d 365 (Utah 1979) (a similar notice provision held not to apply to extra work specifically ordered by project engineers.)

It is clear here that NPC did not follow the requirements of the Standard Specifications. It informed the engineer to keep accounts on fencing and excavation, yet filed claims for other items. Furthermore, NPC is incorrect in stating that the contract required that ADOT request the necessary information from NPC. Subsection 105.17 clearly makes it incumbent upon the contractor not only to give notice but to furnish proper information to the state engineer so he can keep strict account of the actual cost. Subsection 109.04 lends further support to this proposition.

■ Relying on *Dushoff v. Phoenix Company*, 22 Ariz.App. 445, 528 P.2d 637 (1974), rehearing den., 23 Ariz.App. 238, 532 P.2d 180 (1975), NPC contends that there was a jury issue as to the sufficiency of the notice required by subsection 105.17 and, in fact, convinced the trial court to submit the issue to the jury. Since the jury resolved the issue in its favor, NPC contends that we are bound by the determination of the jury. We do not agree. The *Dushoff* case involved the granting by the trial court of a summary judgment in a case involving a lease. One of the issues was whether or not the plaintiff landlord gave notice of default as required by the lease. Division One of this court stated that the question of whether adequate notice of default was given was a question of fact and summary judgment should not have been granted. The court cited no legal authority for its conclusion. We need not decide if *Dushoff* was correctly decided in the posture in which it came before the appellate court. The rule is, where there is conflicting evidence on the question of whether a person had notice, the issue is one for the jury, but whether a written notice is sufficient is a question for the court. 58 Am.Jur.2d Notice § 33. Whether a proper notice was given is a question of law where the determination depends on the construction of a written instrument. *Sapiente v. Waltuch*, 127 Conn. 224, 15 A.2d 417 (1940); *Truslow & Fulle, Inc. v. Diamond Bottling Corporation*, 112 Conn. 181, 151 A. 492 (1930).

■ Except for the fence and excavation of the remaining roadway, ADOT did not receive sufficient written notice of the work items that were being claimed as extra until June 27, 1978. Some items at that time were yet to be completed. Assuming arguendo that NPC did give sufficient notice, it did not furnish the state the means to keep track of the work as is required by subsection 105.17. Having failed to both give the notice and furnish the information, the waiver provisions of subsection 105.17 apply. The trial court erred in allowing recovery for extra work done before June 27, 1978.

## DAMAGES

■ Since it appears that some of the work claimed as extra was performed after June 27, 1978, and that it will be necessary to remand this case to the trial court for further proceedings as to those items, we address the issue of proof of damages. As to some items of damage, NPC did not

keep separate accounts and did not prove the actual costs but, instead, used what is known as a cost comparison approach to prove its damages. Under this approach, the contractor's original estimated cost of completing an item of work is subtracted from the final actual cost, and the difference represents the damages or the cost of doing the extra work. ADOT contends that NPC could only prove its damages in this case by what it actually spent to do the work and not by estimating. We agree. In *Joseph Pickard's Sons Company v. United States*, 532 F.2d 739, 209 Ct.Cl. 643 (1976), the court disallowed the proving of damages by a cost comparison method which the contractor attempted to justify by invoking the same legal maxims which NPC does in this case. There the court said:

> "Treating liability as thus established, plaintiff then proceeds to justify its general approximation of damages, not by undertaking to explain its inability to produce any evidence of actual damage from delay but by expansively invoking the maxim that where liability is established 'absolute certainty or precise mathematical accuracy' is not an invariable prerequisite to a damage award. *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 729 (1964) and cases cited therein. In short, plaintiff says that because liability was shown, it was entitled to receive a so-called 'jury verdict' type of damage award from the Board.
>
> *    *    *    *    *    *
>
> While it is true that a clear showing of liability is indispensable to a recovery, it is equally well-settled that the amount of the recovery can only be approximated in the format of a 'jury verdict' where the claimant can demonstrate a *justifiable* inability to substantiate the amount of his resultant injury by direct and specific proof; something that, according to the Board's unchallenged factual determinations, was not done here.
>
> *    *    *    *    *    *

In *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946), a case, like *Eastman* and *Story Parchment* before it, involving a challenge to a jury's approximation of civil damages flowing from antitrust violations, the Court again approved such an award in appropriate circumstances and in so doing reemphasized the twin requirements that such circumstances must include an unmistakable showing (1) that a legal injury has occurred and (2) *that for reasons beyond its control, typically the conduct of the defendant, the claimant was prevented from specifically proving its damages.* (citations omitted)

More recently the Court has again made clear that relaxation of the requirement that an injured party support his damage claim with definite and specific proof may be countenanced only where such proof is *not reasonably available to him.* Thus, in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 148 (1969), another civil antitrust damage suit where a jury's approximation was approved, it said: 'Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; *damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.*' (emphasis added)

*    *    *    *    *    *

In asking for damages measured by a fraction of total 1967 production costs the plaintiff has offered neither the Board nor this court any explanation, much less justification for its total failure to present direct proof of additional costs that resulted from delay stemming from the change order dealing with welding. Certainly there was nothing inherent in the change order action, of which plaintiff had ample advance notice, *that would realistically have prevented it from assembling such proof.* Clear and

consistent Supreme Court doctrine requires that plaintiff's claim be denied for lack of adequate proof of damage." (emphasis added) 532 F.2d at 742 and 744.

NPC contends that it did not use the total cost concept since it only applied the concept to selective items. Therefore, NPC argues it has met its burden. We do not agree. The total cost concept even when applied to selective items and rhetorically labeled "reasonable," cannot be accepted under the facts here. See *Fattore Co., Inc. v. Metropolitan Sewage Com'n.*, 505 F.2d 1 (7th Cir.1974).

NPC's only justification for not keeping actual accurate cost records of the extra work is the argument that it has previously made, that it did not have to do so because it was the burden of the state to keep track of the costs. This argument is totally devoid of merit. As we have previously indicated the burden was not on the state to take affirmative steps to see that the cost information was provided to it. Instead, the burden was on the contractor to furnish the information to the state. In fact, NPC did keep track of all of the costs on the project but did not record the rework costs *separately*. It was only when the trial court would not admit its exhibits on costs since NPC could not identify which items were due to the rains and flooding, that it resorted to the modified total cost approach. As in *Pickard's*, NPC showed no valid reason why it could not and did not keep track of the costs. It would be the height of folly to reward NPC's failure to notify the state of the additional work which it was doing and failure to keep track of its actual costs by allowing it to make an estimate, based on the total cost method, which could very well contain elements of costs attributable to the inefficiency of the contractor and allow for correction of bidding errors.

### THE ENGINEER'S DECISION

■ Subsection 105.01 of the Standard Specifications states:

"The engineer will decide *all questions* which may arise as to the quality and acceptability of materials furnished and work performed and as to the rate of progress of the work; *all questions* which may arise as to the interpretation of the plans and specifications and *all questions* as to the acceptable fulfillment of the contract on the part of the contractor. * * * " (Emphasis added.)

ADOT contends that NPC had no cause of action in this case since under the contract the decision of the engineer was final, conclusive and binding in the absence of allegation and proof of fraud, mistake amounting to bad faith, failure to exercise an honest judgment or gross error. We do not agree.

■ Where the parties, by the terms of the contract, agree upon an arbitrator or other person to construe the contract and fix and determine obligations under it, parties must seek their remedies according to the terms of the contract, and those terms will be enforced in all cases in the absence of fraud, bad faith or mistake. *United States v. Ellis*, 2 Ariz. 253, 14 Pac. 300 (1887); see also *State v. Kisselburg*, 27 Ariz. 336, 233 Pac. 580 (1925) and *Park Imperial, Inc. v. E.L. Farmer Construction Co.*, 9 Ariz.App. 511, 454 P.2d 181 (1969). The difficulty with ADOT's argument here is that the contract does not make the state engineer the final arbiter of disputes between the parties. In *United States v. Ellis*, supra, the language of the contract provided:

"Should any objection be made to the action of the officer designated to inspect and receive the barley, the case will be decided by a board of officers, subject to the approval of the Department Commander." 2 Ariz. at 254, 14 P. 300.

In *State v. Kisselburg*, supra, the contract provision provided:

"All questions of controversy which may arise between the contractor and the state, under and with reference to this contract, shall be subject to the decision of the state engineer, and his decision shall be final and conclusive on both parties." 27 Ariz. at 338, 233 P. 580.

And in *Park Imperial, Inc. v. E.L. Farmer Construction Co.*, supra, the contract provided for submission to arbitration of disputes arising under the contract. The contractual provisions in the foregoing cases are markedly different from those here. Subsection 105.01 does not make the state engineer the final arbitrator as to *disputes or controversies*. Section 105 is entitled "CONTROL OF WORK" and subsection 105.01 is entitled "Authority of the Engineer." Subsection 105.01 is not an arbitration or dispute-resolution clause but, rather, delineates the engineer's authority as the head and controller of the project.

## THE REMISSION OF THE LIQUIDATED DAMAGES

■ Subsection 108.08 of the Standard Specifications states:

"For each calendar day or working day, as specified, that any work shall remain incompleted [sic] after the contract time specified for the completion of the work provided for in the contract, the sum shown in the schedule of liquidated damages specified below will be deducted from any monies due the contractor, not as a penalty, but as liquidated damages; provided however, that due account will be taken of any adjustment of the contract time for the completion of the work allowed under the provisions of subsection 108.07.

Permitting the contractor to continue and finish the work or any part of it after the time fixed for its completion or after the date to which the time for completion may have been extended, will in no way operate as a waiver on the part of the Department of any of its rights under the contract."

Subsection 108.07 states that the state "may waive such portions of the liquidated damages as may accrue after the work is in condition for safe and convenient use by the traveling public."

The evidence shows that the contract time for the Tubac project expired on April 23, 1979. On that date, there remained several items of work to be completed by the contractor: (1) installation of five flood gates; (2) placement of guardrails; (3) putting in chain link fence and (4) erecting line fence. The estimated total value of the remaining items was $83,355. Although notified of the unfinished work, the contractor did not complete the items until September 13, 1979, some 97 days over the contract time.

The state engineer extended an additional 22 days' credit and assessed the contractor 75 days' liquidated damages, in the amount of $31,500, computed according to a schedule of liquidated damage contained in the Standard Specifications.

In *Sides Construction Company v. City of Scott City*, 581 S.W.2d 443 (Mo.App. 1979), the court discussed stipulations for liquidated damages in cases such as we have here. It stated:

"The right to stipulate for liquidated damages for delay in completing construction of public works is generally recognized, and the stipulated amount may be recovered, if reasonable. Provisions for fixed per diem payments for delay in the performance of such contracts are usually construed as stipulations for liquidated damages, and not as penalties, where the actual damages are uncertain or are difficult of ascertainment, as where the stated sum is a reasonable estimate of probable damages or is reasonably proportionate to actual damages.

In deciding such questions, the courts should consider the nature of the contract, the public detriment to be contemplated by the delay, and the difficulty in approximating damages as a result of the delay. In such cases, the courts generally hold that such contractual provisions are stipulations for liquidated damages, and are not penalties. (citations omitted)

There was a time when the courts were quite strong in their view that almost every contract clause containing a liquidated damage provision was, in fact, a forfeiture provision which equity abhorred, and therefore, nothing but ac-

tual damages sustained by the aggrieved party could be recovered in case of contract breach caused by delay past the proposed completion date. But, in modern times, the courts have become more tolerant of such provisions, probably because of the Anglo-Saxon reliance on the importance of keeping one's word, and have become more strongly inclined to allow parties to make their own contracts and to carry out their own intentions, free of judicial interference, even when such non-intervention would result in the recovery of a prestated amount as liquidated damages...." (citations omitted) 531 S.W.2d at 446–47.[1]

The court in *Sides* then looked at the amount of the liquidated damages, compared it to the original amount of the contract, and decided the amount was so oppressive or so greatly disproportionate to the total amount of the contract as to be a penalty. It is equally clear in the case here that the amount of liquidated damages was not oppressive or greatly disproportionate to the total amount of the contract and was therefore considered as liquidated damages and not as a penalty.

NPC does not contend that ADOT was not justified in assessing liquidated damages under the contract but, rather, contends that it wrongfully refused to waive liquidated damages. We do not agree. The provision in the specification which allows ADOT to waive portions of the liquidated damages is within the absolute discretion of ADOT. Even though the main line of the roadway was open to traffic while the late penalty was being assessed, ADOT had an absolute right to refuse to waive the liquidated damages.

The trial court erred in not directing a verdict in favor of ADOT on the issue of recovery of the liquidated damages.

## ATTORNEY'S FEES

■ ADOT next contends that the trial court erred in awarding NPC attorney's fees, expert witness fees and costs. We agree.

Actions against the state on contract claims and negligence claims are governed by A.R.S. §§ 12–821 et seq. A.R.S. § 12–825 states:

"If judgment is rendered for the plaintiff, it shall be for the amount actually due from the state to the plaintiff, with legal interest thereon from the time the obligation accrued and without costs."

It has been held that A.R.S. § 12–825, as far as taxation of costs is concerned, applies only to cases involving liquidated damages. See *State v. Juengel*, 15 Ariz. App. 495, 489 P.2d 869 (1971).

■ A claim on a contract is "liquidated" if the evidence furnishes data which, if believed, makes it possible to compute the amount owed with exactness and without reliance upon opinion or discretion. *Homes and Sons Construction Co., Inc. v. Bolo Corporation*, 22 Ariz.App. 303, 526 P.2d 1258 (1974). NPC's claim here was for liquidated damages.

The trial court awarded the expert witness fees, attorney's fees and costs pursuant to A.R.S. § 12–348(A)(3) which states:

"In addition to any costs which are awarded as prescribed by statute, a court shall award fees and other expenses to any party other than this state which prevails by an adjudication on the merits in any of the following:

\* \* \* \* \* \*

(3) A court proceeding to review an agency decision, pursuant to title 12, chapter 7, article 6, or any other statute authorizing judicial review of agency decisions."

The foregoing statute refers to court proceedings under the Administrative Review Act. This was not a court proceeding under such an act, but was rather a suit on contract against the state pursuant to A.R.S. § 12–821 et seq. Therefore, the court erred in applying the foregoing statute.

■ NPC argues that if § 12–348 does not apply, then § 12–341.01, which allows

---

1. See Annot. 12 A.L.R. 4th at 891: "Contractual provisions for per diem payments for delay in performance as one for liquidated damages or penalty."

recovery of attorney's fees in any contested action arising out of contract, justifies the action of the trial court in awarding attorney's fees. We do not agree. A.R.S. § 12–825 is a specific statute governing what a plaintiff can recover in contract and negligence claims against the state. Section 12–341.01 is a general statute. Where a general statute conflicts with a specific statute, the specific statute governs. *State v. Rice*, 110 Ariz. 210, 516 P.2d 1222 (1973). Furthermore, since § 12–825 does not allow recovery of costs in a case such as this, it would be ludicrous to interpret the statute as allowing attorney's fees under § 12–341.01.

In view of our disposition, it is unnecessary to discuss ADOT's contention that the court abused its discretion in allowing Donald Riggs to testify as an expert witness.

Since there may be some sums of money that may be recoverable for extra work done on June 27, 1978 and thereafter, it will be necessary to remand this case for further proceedings.

The judgment is vacated and set aside, and the case is remanded for further proceedings consistent with this opinion.

BIRDSALL, C.J., and HATHAWAY, J., concur.