RESTANI, Judge.
 

 Appeal from decision of the United States Department of Agriculture Board of Contract Appeals (“AGBCA”), Docket Numbers 87-344-1 and 88-172-1, denying plaintiffs consolidated appeal for: (1) reformation or termination of its timber-sale contract with the Forest Service; and, (2) damages. We
 
 affirm.
 

 This appeal presents two issues; namely, whether the AGBCA erred in determining that plaintiff was not entitled to rely on the information misrepresented by the Forest Service and whether it erred in finding insufficient proof of injury to necessitate modification of the stumpage rates provided for in the timber-sale contract at issue.
 
 [1]
 

 I. BACKGROUND
 

 A.
 
 Factual Setting Prior To Contract
 
 Formation
 
 [2]
 

 On August 25, 1981, Roseburg Lumber Company was awarded the Corral Timber Sale, Contract No. 050158, at an oral auction conducted by the Forest Service. The sale area encompassed five species of timber.
 
 [3]
 

 Pursuant to the National Forest Management Act (“NFMA”), 16 U.S.C. § 472a (1988), and the NFMA’s implementing regulations, 36 C.F.R. § 223.4(a)-(g) (1981),
 
 [4]
 
 before conducting a timber auction the Forest Service is required to estimate the fair market value of each species of timber included in the proposed sale. 36 C.F.R. § 223.60 (1991). The process of appraising the volume and quality of timber located on a proposed sale area is termed a “cruise.” Based upon its cruise, the Forest Service is required to establish a “minimum stump-age rate” for each species of timber. 36 C.F.R. § 223.61 (1991). A stumpage rate is the per unit price paid by a timber purchaser, often expressed as the price paid per thousand board-feet (“MBF”) of wood. The NFMA prohibits the Forest Service from offering timber for sale at less than its appraised value. 16 U.S.C. § 472a(a) (1988). Thus, a minimum stumpage rate represents the legal minimum acceptable bid rate (“MABR”) for a particular species of timber. The Forest Service may not
 
 *662
 
 entertain bids which fail to meet this threshold price.
 

 Federal regulations permit the Forest Service to choose from among various appraisal methods.
 
 See
 
 16 C.F.R. § 223.60 (1991). In this instance, it employed a residual appraisal methodology. The Forest Service first estimated the selling value of lumber to be produced from the sale, by species; it then subtracted values associated with costs of production, including an allowance for risk and profit margins. Normally the residual figures represent fair market values for each timber species, and thus provide MABR values against which bids may be measured. In this case, however, the Forest Service failed to subtract logging costs for four of the five timber species. This unintentional error resulted in inflated MABR figures for Ponderosa Pine, Sugar Pine, Douglas Fir, and Incense Cedar.
 
 [5]
 
 The Forest Service published these erroneous MABR figures in the sale’s advertisement, prospectus, and bidding documents. In fact, the sale’s prospectus expressly stated that “[a]dvertised rates are the minimum acceptable bid rates” which “have been established by appraisal....”
 
 [6]
 
 Timber Sale Prospectus, at 2. The following table provides a comparison of the published figures with accurately calculated MABR values:
 

 Advertised Actual
 

 Species MABR/MBF ' MABR/MBF
 

 Ponderosa Pine $ 95.35 $ 18.08
 

 Sugar Pine $ 91.91 $ 18.08
 

 White Fir $ 9.08 $ 9.08
 

 Douglas Fir $ 86.27 $ 18.08
 

 Incense Cedar $ 76.09 $ 9.08
 

 Each species of timber would have been advertised at actual MABR values, had the Forest Service not made the computational errors.
 

 Pursuant to 16 U.S.C. § 472a(e)(2), before conducting the oral auction the Forest Service solicited written sealed qualifying bids. Participants were required to submit bids that specified the stumpage rates being offered for
 
 each
 
 species of timber. Only those potential purchasers who submitted bids containing stumpage rates equal to, or in excess of, published MABR values for
 
 each
 
 of the five species of timber were permitted to participate in the oral auction. A total of four bidders, including Roseburg, submitted satisfactory qualifying bids. All participants premised their bids on partially inflated MABR data.
 

 Before bidding on the Corral Timber Sale, Roseburg conducted its own cruise of the sale area, formulating its own estimates of timber volume, by species. Rose-burg then developed a bidding strategy based upon its independent volume estimates, as well as location of the sale area, timber quality, anticipated competition, and expectations of future timber availability.
 

 In contrast to the sealed-bid phase of the sale, during the oral auction all bids were submitted on a lump-sum basis. Thus a bidder was forced to combine internal cost-benefit analyses of logging the various timber species, in order to determine an acceptable aggregate price range within which to bid. Based upon published MABR values and Forest Service estimates of timber volume, the advertised value of the sale was $930,630. It was anticipated that market forces would compel the high bidder to offer well in excess of this sum. In fact,
 
 *663
 
 Roseburg was awarded the contract with a final bid of $3,171,000 which was $1,000 more than Roseburg's closest competitor.
 
 [7]
 

 Despite being auctioned on a lump-sum price basis, the Corral timber was actually sold on a scaled basis; that is, payments were to be calculated by multiplying contractual stumpage rates (which are specified after the bid is awarded) by volume measurements taken as timber is physically removed from the sale area. Thus, the total price ultimately paid could be determined only after all designated timber had been removed. The contract did
 
 not
 
 vest Roseburg with discretion over the volume of timber to be logged; all timber meeting contract specifications was required to be removed in accordance with the contract’s cumulative removal schedule.
 
 [8]
 
 Failure to meet yearly targets set by the removal schedule resulted in cash payments to cover the value of such timber left standing.
 
 [9]
 

 Calculation of contractual per species stumpage rates, the root of the instant dispute, depended upon the amount of allo-cable “bid premium.” Bid premium, also known as “overbid,” is defined as the amount by which the winning bid exceeds the appraised value of the sale. Accordingly, the bid premium is determined by the original Forest Service estimates of timber volume and total sale value, as well as Roseburg’s winning bid price. Published MABR values reflected the Forest Service’s appraisal of total sale value at $930,-630. Therefore, Roseburg had $2,240,370 to allocate as bid premium. Following award of the contract, Roseburg was required to apportion this amount among four of the five species of timber included in the sale.
 
 [10]
 
 As a result of its cruise, Roseburg believed that the Forest Service had considerably overestimated the volume of White Fir located on the sale area; therefore, it was to Roseburg’s advantage to allocate the entire amount of bid premium to White Fir. This is precisely what Roseburg chose to do. Dividing total bid premium by the Forest Service volume estimate of 1,800 MBF results in an overbid allocation of $1,244.65 per MBF of White Fir. As a result, the executed contract resulted in the following terms:
 

 Species Allocated Bid Premium Final Stumpage Rate/MBF Gov't Estimated Volume Estimated Price
 

 Ponderosa Pine $ 0.00 $ 95.35 3,900 MBF $ 371,865
 

 Sugar Pine $ 0.00 • $ 91.91 1,700 MBF $ 156,247
 

 White Fir $ 1,244.65 $ 1,253.73 1,800 MBF $ 2,256,714
 

 Douglas Fir $ 0.00 $ 86.27 4,300 MBF $ 370,961
 

 Incense Cedar $ 0.00 $ 76.09 200 MBF $ 15,218
 

 Totals: 11,900 MBF $ 3,171,005
 
 [11]
 

 Had the Forest Service provided accurate MABR values, and assuming Roseburg’s winning bid remained $3,171,000, and assuming allocation of all of bid premium to White Fir, Roseburg’s bid after allocation of bid premium would have been:
 

 
 *664
 
 Allocated . Stumpage Gov’t Estimate Estimated Species Bid Premium Rate/MBF Volume Price
 

 Ponderosa Pine $ 0.00 $ 18.08 3,900 MBF $ 70,512
 

 Sugar Pine $ 0.00 $ 18.08 1,700 MBF $ 30,736
 

 White Fir $ 1,652.14 $ 1,661.22 1,800 MBF $ 2,990,196
 

 Douglas Fir $ 0.00 $ 18.08 4,300 MBF $ 77,744
 

 Incense Cedar $ 0.00 $ 9.08 200 MBF $ 1,816
 

 Totals: 11,900 MBF $ 3,171,004
 
 [12]
 

 Thus, while total bid price would remain unchanged under this scenario, individual stumpage rates would be substantially altered.
 

 The government relies upon disclaimers contained within the prospectus and bid documents. The sale prospectus provided, in part:
 

 1.
 
 INTRODUCTION.
 
 This prospectus is to furnish sufficient information in addition to that contained in the published advertisement, to. enable prospective bidders to decide whether further investigation of the sale is warranted. INFORMATION GIVEN HERE OR OTHERWISE PROVIDED IS NOT A PART OF THE CONTRACT UNLESS STATED THEREIN. DETAILED CONDITIONS OF SALE ARE CONTAINED IN THE SAMPLE TIMBER SALE CONTRACT. IN THE EVENT A CONTRADICTION EXISTS BETWEEN THIS PROSPECTUS AND THE SAMPLE CONTRACT, THE CONTRACT GOVERNS. Timber Sale Contract, Form 2400-6, will be used. Sale area and sample contract should be inspected before submitting a bid____
 

 In addition, the bidding instructions issued by the Forestry Service provided, in part:
 

 1. CONDITIONS AFFECTING SALE COMPLIANCE PRIOR TO BIDDING. Bidders should inspect the sale area, review the requirements of the sample timber sale contract, and take such other steps as may be reasonably necessary to ascertain the location, estimated volumes, quality development, and operating costs of the offered timber. Failure to do so will not relieve bidders from responsibility for completing the contract.
 

 Finally, the bid form contained the following notation in bold face type directly above the location for Roseburg’s signature:
 

 BIDDERS ACKNOWLEDGE THAT FOREST SERVICE ESTIMATES OF COSTS AND TIMBER VOLUMES ARE NOT GUARANTEED AND THAT THE FOREST SERVICE GRANTS NO WARRANTY, EITHER EXPRESS OR IMPLIED OF THEIR ACCURACY.
 

 B.
 
 Proceedings Following Contract Formation
 

 On about November 2, 1981, after execution of the contract, Roseburg learned of the Forest Service’s errors in calculation of MABR values, and the resultant errors in all of the bid documents. Between November 5, 1981 and May 10, 1983, Roseburg conducted ongoing discussions with the Forest Service and Department of Agriculture in an effort to modify the contract rates. The Forest Service admitted its error in calculating the MABR values, but refused to modify or cancel Roseburg’s contract.
 

 If there had been no original appraisement errors and Roseburg’s bid employed the correct MABR values, and assuming that Roseburg was awarded the contract as a result of its $3,171,000 bid, and assuming allocation of all bid premium to White Fir, the rates established by the correct appraisal would have been: $18.08 for Ponde-rosa Pine; $18.08 for Sugar Pine; $1,661.22 for White Fir; $18.08 for Douglas Fir; and $9.08 for Incense Cedar. On April 15, 1987, Roseburg requested that the Forest Service’s Contracting Officer (“CO”) modify the contract to reflect these stumpage rates, rather than those em
 
 *665
 
 ployed in the original contract. The CO denied this request on April 27, 1987. Roseburg timely appealed to the AGBCA.
 

 On November 12, 1987, Roseburg submitted a certified claim for $24,071.53 to the CO, as the amount by which it had allegedly overpaid the Forest Service for approximately 540 MBF of timber removed during June and July of that year. Rose-burg also requested that the contract either be terminated, or that the stumpage rates be revised to correct for original errors made in the calculation of MABR values. The CO denied this request on January 12, 1988. Roseburg timely appealed to the AGBCA.
 

 Roseburg’s two appeals were consolidated, and the AGBCA conducted a hearing on November 29, 1988. Roseburg revised the amount of its claim to $49,426.61 at that hearing, to correct for a miscalculation in its original claim. In a written opinion dated July 22, 1991, the AGBCA denied both appeals in their entirety, finding neither a mutual mistake nor damages. Rose-burg presently appeals the decision of the AGBCA pursuant to 41 U.S.C. § 607(g)(1)(A) (1988).
 

 II. STANDARD OF REVIEW
 

 This appeal is governed by the Contract Disputes Act of 1978, which provides that “the decision of the agency board on any question of law shall not be final or conclusive____” 41 U.S.C. § 609(b) (1988). Thus, contract interpretation, a question of law, mandates
 
 de novo
 
 review.
 
 See American Electronics Lab. v. United States,
 
 774 F.2d 1110, 1112 (Fed.Cir.1985). Still, a board’s legal interpretations are accorded careful consideration in recognition of its expertise.
 
 US West Communications Servs., Inc. v. United States,
 
 940 F.2d 622, 625 (Fed.Cir.1991). The AGBCA’s determination that Roseburg was not entitled to rely on the Forest Service’s misrepresentation of MABR values is reviewed
 
 de novo.
 

 Agency board decisions on questions of fact “shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.” 41 U.S.C. § 609(b). The AGBCA’s finding that Roseburg was not injured by Forest Service misrepresentations of MABR values is reviewed for substantial evidence.
 

 This court will not disturb AGBCA findings of fact if they are supported by substantial evidence, despite the existence of support for alternative findings in the record.
 
 See Fruin-Colnon Corp. v. United States,
 
 912 F.2d 1426, 1428-29 (Fed.Cir. 1990);
 
 Erickson Air Crane Co. v. United States,
 
 731 F.2d 810, 814 (Fed.Cir.1984). As a result, Roseburg must meet a heavy burden in order to establish that the AGBCA’s factual finding should be set aside.
 
 Fruin-Colnon Corp.,
 
 912 F.2d at 1429;
 
 Koppers Co. v. United States,
 
 186 Ct.Cl. 142, 405 F.2d 554, 556-58 (1968).
 

 III. DISCUSSION
 

 Where there has been a mutual mistake of material fact, resulting in a contract which does, not faithfully embody the parties’ actual intent, reformation, rescission, and restitution may be available to the adversely affected party.
 
 See Southwest Welding & Mfg. Co. v. United States,
 
 179 Ct.Cl. 39, 373 F.2d 982 (1967); Restatement (Second) of Contracts §§ 152,155, 158 (1979). With regard to government contracts, the Comptroller General of the United States has stated:
 

 “The general rule is that a contract made through mutual mistake as to material facts may either be rescinded or re-formed____ Further, it is an additional rule that mistake on .one side and misrepresentation, whether willful or accidental, on the other, constitute a ground for reformation where the party misled has relied on the misrepresentation of the party seeking to bind him____ Restitution in these circumstances may be obtained on the premise that it would be unjust to allow one who made the misrepresentation, though innocently, to retain the fruits of a bargain which was
 
 *666
 
 induced, in whole or in part, by such misrepresentation.”
 

 Matter of Morgan Roofing Co.,
 
 Comp.Gen. Dec. B-181885 (Dec. 17, 1974) 54 Comp. Gen. 497, 498
 
 (quoting Matter of Crawford Paint Co.,
 
 Comp.Gen.Dec. B-159064 (May 11, 1966)). This view was subsequently cited with approval by the AGBCA in the context of a timber removal contract, in
 
 Louisiana-Pacific Corp.,
 
 AGBCA No. 80-186-3, 81-1 BCA ¶ 14,928 at 73,863 (Feb. 13, 1981). For Roseburg to prevail, it must establish that, under the appropriate standard of review, the AGBCA must be held to have erred in deciding the following issues: (1) whether Roseburg was entitled to rely on the information misrepresented by the Forest Service and, (2) if so, whether Roseburg suffered injury as the result of relying upon Forest Service misrepresentations.
 

 A.
 
 The Forest Service’s misrepresentation materially affected the contract terms.
 

 The AGBCA found that “Appellant determined the amount it was prepared to bid on the basis of the advertised sale. Appellant determined what timber was on the site and what actual value it held to Appellant. Appellant bid accordingly; there was no mistake on Appellant's part and no evidence Appellant was damaged.” AGBCA Nos. 87-344-1 and 88-172-1, July 22,, 1991, at 14. (hereinafter “AGBCA Op.”) Roseburg argues that Forest Service regulations requiring that “[tjimber shall be advertised for sale at its appraised value”
 
 [13]
 
 provide an implicit guarantee that appraisal-based calculations which produce published MABR figures will be performed accurately.
 

 Publication of MABR figures did constitute a representation as to the legal minimum below which each species of timber could not be sold.
 
 See
 
 36 C.F.R. § 223.63 (1991). It is undisputed that due to computational errors, the Forest Service published inflated MABR figures in the supporting documents for the Corral Timber Sale.
 
 [14]
 
 Roseburg was one among four bidders who, having submitted sealed bids equal to, or in excess of advertised MABR’s, accepted them as required for bidding and allocation purposes.
 

 The AGBCA’s determination that the Forest Service misrepresentation did not materially impact the oral auction is incorrect. More importantly, however, this finding fails to address what effect the MABR figures had during Roseburg’s allocation of bid premium, the process by which contractual stumpage rates were established. MABR values, essential to the calculation of contractual stumpage rates, are material underlying premises of the contract. The AGBCA made a factual finding as to what contractual stumpage rates would have been, had accurate MABR values been published and assuming all other variables remained constant. AGBCA Op. at 9. Implicit in this finding is a recognition that Roseburg necessarily must utilize, and in that sense, rely on MABR figures during contract formation.
 

 The government argues that language employed in the prospectus and bid documents should be interpreted to disclaim the accuracy of published MABR figures. The argument runs as follows: because MABR’s are based upon government estimates of logging costs and timber volume, the accuracy of which are expressly disclaimed, MABR accuracy is deemed to be waived as well; as a result, if Roseburg could not reasonably rely upon the accuracy of published MABR’s, there can be no misrepresentation. This argument is unpersuasive.
 

 The government offers two grounds for support. First, it raises the broad proposition that an appraisal is conducted exclusively for the public interest.
 
 [15]
 
 Although
 
 *667
 
 the appraisal may be intended to ensure' that the government receives fair value, the MABR serves an additional function; namely, to alert potential purchasers to legally required floor rates, below which their bids will not be entertained. This “notification” function is, by law, solely the responsibility of the Forest Service.
 
 See
 
 16 U.S.C. § 472a(a) (1988); 36 C.F.R. § 223.-60-223.66 (1991). The MABR’s then become part of the contract for bid allocation purposes and are not simply estimates which provide some background information. Thus, in the absence of an applicable disclaimer, reliance would be appropriate.
 

 Second, the government argues there is such a disclaimer and points to language employed in the sale’s documentation. In particular, the bid form provided that “FOREST SERVICE ESTIMATES OF
 
 COSTS
 
 AND TIMBER VOLUMES ARE NOT GUARANTEED ...” (emphasis added). It appears that the government misinterprets the term “COSTS” in the disclaimer. The regulations indicate that the Forest Service is required to estimate those operating costs which the ultimate purchaser will incur when extracting timber from the sale area.
 
 [16]
 
 Thus, the cost estimates contemplated by the disclaimer are those expenditures necessary to conduct a normal logging operation, including margins for profit and risk.
 
 [17]
 
 The disclaimer serves only to alert potential bidders to the fact that they should prepare their own cost and volume estimates before submitting a bid, as actual costs and volume may differ from the estimates. This is quite distinct from a computational error which totally excludes costs in calculating MABR’s.
 

 In sum, under the facts of this case the government may not disclaim the published MABR figures, as the disclaimer does not apply and the winning bidder necessarily must rely upon MABR figures when allocating its bid premium during contract formation. This, however, does not mean that plaintiff is entitled to relief.
 

 B.
 
 Plaintiff has not demonstrated that the Forest Service misrepresentation caused injury.
 

 In order to justify reformation of a contract and damages on the ground of misrepresentation, innocent or not, the evidence must establish not only the existence of a misrepresentation, but also that the party seeking relief both relied upon such misrepresentation, and was damaged thereby.
 
 See Timber Investors, Inc. v. United States,
 
 218 Ct.Cl. 408, 587 F.2d 472, 475 (1978);
 
 Associated Traders, Inc. v. United States,
 
 144 Ct.Cl. 744, 169 F.Supp. 502, 505-06 (1959).
 

 Contract law has long been held to preclude recovery for speculative damages.
 
 Story Parchment Co. v. Paterson Parchment Paper Co.,
 
 282 U.S. 555, 562-63, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). Absent tangible proof of damages, appellant may not recover for an alleged injury.
 
 See Assurance Co. v. United States,
 
 813 F.2d 1202, 1205 (Fed.Cir.1987);
 
 Joseph Pickard’s Sons Co. v. United States,
 
 209 Ct.Cl. 643, 532 F.2d 739, 744 (Ct.Cl.1976). Simply showing errors in the appraisal will not entitle Roseburg to recovery.
 
 See American Forest Prods. Co.,
 
 AGBCA No. 79-170-1, 85-1 BCA ¶ 17,720 at 88,460 (Oct.
 
 *668
 
 18, 1984). This principle applies to the threshold issue of whether damages have actually been sustained, however, and does not bar the award of damages for a proven injury of uncertain measure.
 
 Id.
 
 “[Wjhere responsibility for damage
 
 is
 
 clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision____”
 
 Electronic & Missile Facilities, Inc. v. United States,
 
 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969) (emphasis in original).
 

 Roseburg repeatedly notes that the actual contract price was not fixed and that the contractual stumpage rates on which payment is based would have been different if true MABR values for certain timber species had been published. This verity, however, does not establish proof of injury. Roseburg ignores the implication of the strong competition which characterized the Corral Timber Sale.
 
 [18]
 

 The AGBCA found that Roseburg had not been damaged because had the participants known of the errors, there was a “great chance” that the competition would have forced Roseburg to raise its bid-level in order to obtain the sale. AGBCA Op. at 8. The essence of this finding is a determination that it is far too conjectural to conclude that - Roseburg would have been awarded the contract at a price of $3,171,-000 had the Forest Service published correct MABR values.
 

 The determination that publication of lower MABR’s in the present case likely would have resulted in higher bidding at the oral auction is amply supported. Both the record as well as normative economic behavior indicate that had participants relied upon lower MABR values, the competition would have forced the ultimate purchaser to pay a higher price. As reduced MABR’s clearly would increase potential profit margins for all bidders, regardless of the analytical methodology they employed, it seems probable that the prospect of greater profit would have induced all participants to bid to higher levels.
 

 Roseburg does not dispute the AGBCA finding that based upon accurate MABR data, it would have been willing to bid up to $5,300,000 for the Corral Timber Sale contract.
 
 See
 
 AGBCA Op. at 6. This is $881,000 more than the maximum bid it was prepared to submit based upon advertised MABR data.
 
 See
 
 AGBCA Op. at 6. Thus, the AGBCA was correct in concluding that it is far too speculative to assume that Roseburg would have won the contract at a price of $3,171,000. Furthermore, it is entirely possible that had accurate MABR data been published, and had Roseburg been awarded the contract at an increased bid level, the accompanying increase in stumpage rate for White Fir after allocation of all bid premium would be so high as to negate any benefit from reduced stumpage rates for Ponderosa Pine, Sugar Pine, Douglas Fir, and Incense Cedar. In addition, had the Forest Service published accurate MABR data, there is nothing in the record to support a finding that Rose-burg would have been the high bidder for the sale. Thus, it is impossible for this court to ascertain what effect reduced rates would have had on bidding patterns at the auction.
 

 Appellant bears the burden of proving injury. The AGBCA determined that it had failed to do so, and this court sees no error in that finding.
 

 C.
 
 If viewed as a case of mutual mistake, plaintiff is not entitled to recover.
 

 This case has been presented as both one of mutual mistake and misrepresentation. Where the party seeking reformation alleges an innocent mutual mistake,
 
 [19]
 
 that party must establish: (1) that the contract did not place the risk of mistake upon the party seeking reformation;
 
 and,
 
 (2) that the party against whom reformation is sought would have agreed to the
 
 *669
 
 reformation, had it known the correct facts from the outset.
 
 Edwards v. United States,
 
 19 Cl.Ct. 663, 674 (1990)
 
 (citing National Presto Indus., Inc. v. United States,
 
 167 Ct.Cl. 749, 338 F.2d 99, 108 (1964),
 
 cert. denied,
 
 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965));
 
 Flippin Materials Co. v. United States,
 
 160 Ct.Cl. 357, 312 F.2d 408, 415 (1963).
 

 As previously noted, calculation of MABR values is inherently a governmental function which may not be delegated to potential contractual partners in the private sector. Thus, the first element is satisfied, but the government also argues that it is unlikely the Forest Service would have agreed to use of corrected MABR values in its contract with Roseburg, had the error been detected subsequent to the oral auction, but prior to execution of the timber sale contract.
 

 Roseburg responds with the unsupported assertion that had the computational errors been known to the parties, they would not have entered into the contract at inflated MABR rates. The likely actions of the party against whom reformation is sought to be imposed is the key. Use of lower stumpage rates would effectively reduce the price Roseburg paid without any assurance that the bid price would not have been higher given different MABR’s.
 
 See supra,
 
 Section IIIB. The record provides no affirmative support for an alternative conclusion.
 

 Roseburg also reads 16 U.S.C. § 472a(a) to require that the Forest Service accept corrected MABR values when, as in this case, the figures actually employed result in an above-minimum-rates contract. This argument is disposed of by observing that the statute relied on provides that “the Secretary of Agriculture, under such rules and regulations as he may prescribe, may sell, at not less than appraised value, trees, portions of trees, or forest products located on National Forest System lands.”
 
 [20]
 
 This language simply does not compel the result urged by Roseburg.
 

 The record does not support a finding that following the bidding the Forest Service would have agreed to use of corrected MABR values in its 'Contract with Rose-burg, even if the parties had been aware of the computational errors. Reformation is inappropriate under an innocent mutual mistake theory.
 

 The determination of the AGBCA is
 

 AFFIRMED.
 

 [1]
 

 . On appeal, appellant has not pressed its claim for termination. In any case, the remedy of termination is not appropriate unless appellant can succeed on the merits.
 

 [2]
 

 . Unless otherwise indicated, the facts set forth in this opinion are either uncontested or drawn from the AGBCA’s decision and have not been shown to be fraudulent, arbitrary, capricious, grossly erroneous as to necessarily imply bad faith, or unsupported by the evidence. 41 U.S.C. § 609 (1988).
 

 [3]
 

 . The Corral Timber Sale included Ponderosa Pine, Sugar Pine, White Fir, Douglas Fir, and Incense Cedar.
 

 [4]
 

 . These regulations are currently located at 36 C.F.R. § 223.60 — 223.66 (1991). No substantive changes have been made to these provisions during the interim years.
 

 [5]
 

 . The Forest Service correctly calculated the MABR for White Fir.
 

 [6]
 

 . The AGBCA found that “[t]here was nothing particularly unusual about the MABR for the sale and they did not cause Roseburg to question the accuracy of the computations used by the Forest Service to establish those rates."
 
 See
 
 AGBCA Decision, Nos. 87-344-1 and 88-172-1 (July 22, 1991), at 4. The record contains testimony that price variations of up to thirty times are not unusual between White Fir and either Ponderosa or Sugar Pine.
 

 [7]
 

 . The minimum permissible bid increment was $1,000.
 

 [8]
 

 .
 
 See
 
 Corral Timber Sale’s Contract, cl, B6.4, Respondent’s Supplemental Appendix at 37.
 

 [9]
 

 .
 
 See
 
 Corral Timber Sale Contract, cl. C4.262, Respondent’s Supplemental Appendix at 138.
 

 [10]
 

 . No amount of overbid was permitted to be allocated to Incense Cedar (presumably because of low volume): the Forest Service fixed the stumpage rate for Incense Cedar at its established MABR figure.
 

 [11]
 

 . The five dollar deviation from the winning bid price is due to rounding of numbers.
 

 [12]
 

 . The four dollar deviation from the winning bid price is due to rounding of numbers.
 

 [13]
 

 . 36 C.F.R. § 223.4(d) (1981).
 

 [14]
 

 . Four of the five MABR figures were incorrect. The parties do not challenge the accuracy of the original MABR figure for White Fir, published as $9.08 per MBF.
 

 [15]
 

 . The purpose of the appraisal requirement "is to insure that the public receives fair value from the sale of timber.” Further, "[n]o direct benefit is conferred on timber purchasers from the statutory and regulatory requirements for the preparation of appraisals.”
 
 American Forest
 
 
 *667
 

 Prods. Co.,
 
 AGBCA No. 79-170-1, 85-1 BCA If 17,-720 at 88,459 (Oct. 18, 1984).
 

 [16]
 

 . 36 C.F.R. § 223.60 (1991) provides:
 

 The objective of National Forest timber appraisals is to estimate fair market value. The basic procedure will be analytical appraisal under which stumpage value is a residual value determined by subtracting from the selling value of the products normally manufactured from the timber the sum of estimated operating costs, including ... margins for profit and risk.
 

 This provision was formerly 36 C.F.R. § 223.-4(a) (1981).
 

 [17]
 

 . Where the Forest Service disclaims the accuracy of its timber estimates in explicit and unequivocal terms, our predecessor court has recognized that the government is not held to have warranted the accuracy of such estimates.
 
 See Webco Lumber, Inc. v. United States,
 
 230 Ct.Cl. 457, 677 F.2d 860, 863 (1982) (government not liable for discrepancy between actual and estimated timber volumes where disclaimer explicitly and unequivocally stated that government was not making warranty about quality of recoverable timber).
 

 [18]
 

 . The AGBCA found that: (1) at the time of bidding, competition for timber was strong; (2) sales in general were being bid to high levels; and, (3) Roseburg anticipated strong competition for this particular sale. AGBCA Op. at 5.
 

 [19]
 

 . As both parties accepted the MABR figures as accurate, one might analyze the dispute in these terms.
 

 [20]
 

 . 16 U.S.C. § 472a(a) (1988).